**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. ELH-24-311** |
| | * | |
| **JAMES EDWARD HOWETH,** | * | |
| **Defendant.** | * | |
| | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\***

**GOVERNMENT'S CONSOLIDATED RESPONSE**
**TO DEFENSE PRE-TRIAL MOTIONS**

The United States of America respectfully submits this consolidated response to the following two pre-trial motions filed by James Edward Howeth ("Howeth" or "Defendant") in this matter:

1. Defense Motion to Suppress Evidence and Request for Frank's Hearing (ECF 47); and

2. Defense Motion to Suppress Statements (ECF 50).

## I.    PROCEDURAL BACKGROUND

On March 13, 2024, Dorchester County Circuit Court Judge William H. Jones signed a residential search warrant for Howeth's home in East New Market, Maryland.  On March 14, 2024, law enforcement, specifically members of the Maryland State Police (MSP), executed the warrant and seized several items.  Howeth was interviewed at that time and arrested.  Howeth was brought to the District Court Commissioner and was charged in the District Court for Dorchester County with Sexual Child Abuse (Md. Ann. Code Crim. § 3-602), Possession of Child Pornography (Md. Ann. Code Crim. § 11-208), Distribution of Child Pornography (Md. Ann. Code Crim. § 11-207(a)(4)), all against Minor Victim.  Case No. D-021-CR-24-0159. On May 6, 2024, the State's

Attorney for Dorchester County filed a Criminal Information, charging Howeth with Sexual Child Abuse, Distribution of Child Pornography, Possession of Child Pornography. Dorchester County Circuit Court Case No. C-09-CR-24-0098. Howeth was held without bond by the State of Maryland.

On October 24, 2024, the federal Grand Jury returned a three-count indictment charging Howeth with one count of Sexual Exploitation of a Minor (18 U.S.C. § 2251(a)) and two counts of Possession of Child Pornography (18 U.S.C. § 2252(a)(5)(B)). ECF 1. The State of Maryland dismissed the state Criminal Information in favor of federal charges, and Howeth had his Initial Appearance on October 30, 2024. Howeth waived a detention hearing at that time. Howeth was arraigned on January 10, 2025. He has been held in federal custody since his initial appearance.

On September 25, 2025, the federal Grand Jury returned a Superseding Indictment with the same three offenses. ECF 42.

On October 24, 2025, Howth filed two pretrial motions in this matter (ECF 47 & 50). The Government respectfully submits this consolidated response to Howeth's pretrial motions. A motions hearing is scheduled for February 4, 2026, and a jury trial is set for May 11, 2026.

## II.  SUMMARY OF FACTS

The investigation into Howeth began on October 23, 2023, when the National Center for Missing and Exploited Children (NCMEC) received a CyberTipline report (CyberTip) from Syncronoss Technologies, Inc.[1] (Syncronoss) for suspected Child Sexual Abuse Materials

---

[1] Synchronoss is a cloud-based storage provider for content stored on the Verizon cloud

(CSAM). *See* Def Ex. A (ECF 47-1), CyberTipline report.[2]    Syncronoss reported that a user of their storage service had uploaded one MD5 files of CSAM.   Synchronoss provided all of the suspect information including the Verizon wireless number, ████████4564, and email address, jacron██████████, associated with upload of the CSAM file (henceforth "x4564" and "*jacron*," respectively).  *Id.* at p. 4.  Syncronoss then provided the upload date of September 15, 2023, as well as the filename and descriptor for the file, categorizing that file as a prepubescent minor engaged in a sex act. *Id.* at p. 4, 5. Syncronoss viewed the entire contents of the uploaded file. NCMEC automatically performed queries on the reported identifiers (the cell phone number x4564 and email account *jacron*) and provided the results in the report. *Id.* at p. 6.  The cell phone x4564 was associated with Ann Curl, listing an address for her of 26776 Bee Tree Road, Henderson, Maryland, 21640.  *Id.* at p. 4.  No publicly available information was returned from the query regarding the email *jacron*, and neither the cell phone x4564 or email *jacron* were found to be associated with any other Cybertips.

Based on the open-sourced subscriber location information associated with the cell phone x4564, NCMEC then routed their report to the Maryland Internet Crimes Against Children Task Force. The physical address provided by NCMEC was found to be in Caroline County, so the investigation was sent to the Maryland State Police, Criminal Enforcement Division, Eastern Region which services Wicomico, Caroline, Dorchester, Talbot, Kent and Queen Anne's counties on the Eastern Shore

---

[2] the Government will refer to the Defendant's exhibits, when possible, instead of re-submitting the same exhibits. Because the Defendant re-uses letters to exhibits across both motions, the ECF number of the respective motion will precede the exhibit letter.

Detective Sargent Theodore Antal of MSP began investigating the information given to him in the Cybertip and the open-source suspect information provided by NCMEC. Sgt. Antal viewed the file of alleged CSAM, described as: a female child believed to be under the age of 8, fully nude and in a sexual position on a bed engaging in oral sex with an adult male erect penis.

On November 29, 2023, Sgt. Antal authored a search and seizure warrant to Syncronoss Technologies for information about the cloud account associated with the cell phone x4564 and to search for the CSAM file associated with the Cybertip. The warrant was signed by the Honorable William H. Jones of the Dorchester County Circuit Court. *See* Def. Ex. C (ECF 47-3), Syncronoss Search Warrant. Sgt. Antal received the results of the warrant and reviewed the content of the Syncronoss account associated with x4564. During his review, Sgt. Antal observed two images and a video file depicting bestiality, sexual contact between a dog and a woman, as well as an image of the driver's license belonging to Ann Curl.[3] In the video, a third unseen person is filming and ordering the dog to perform oral sex on the woman.

On December 15, 2023, Sgt. Antal interviewed Ann Curl at her work at ███████████, Maryland. Sgt. Antal recognized that Curl was the female in the video files of bestiality that he found in the Syncronoss account search warrant return. Curl was advised of her Miranda rights, which she agreed to waive. During her interview, Curl stated, among other things, that the cell phone x4564 and Syncronoss account belonged to her. Curl was shown a sanitized version of the CSAM from the Cybertip, and Curl stated she had not seen that image before. Curl was asked if she views CSAM, and she replied no. Curl was asked if there was any CSAM on her phone, and

---

[3] In Maryland, sexual contact with animals is a violation of Md. Code Ann., Crim. Law, § 10-606.

Curl said no but that someone may have texted her a picture before. Curl was also asked about the bestiality files, and Curl responded that it was "a stupid thing to do" but that she did it because she was curious. Sgt. Antal then seized Curl's phone so that he could author a search and seizure warrant for its contents. The Samsung phone appeared purple in color with a serial number ending in xA5BB. Curl provided the passcode to unlock the phone. Curl was not arrested or charged at that time.

On December 18, 2023, Sgt. Antal authored a search and seizure warrant for the contents of Curl's cell phone from September 15, 2023 (the date of the Cybertip CSAM upload from x4564 and *jacron)* to present (the time when the phone was seized from Curl). *See* Def. Ex. F (ECF 47-6), Search Warrant for Curl's Phone 12/18/23. The warrant was signed by the Honorable Joseph A. Riley of the District Court for Caroline County. The search of Curl's cell phone was done at the Talbot County Sheriff's Office Criminal Investigations Division by Cpl. S. Faggert. Curl's Samsung cell phone was assigned cell phone number x4564 but the associated email was found be to a Yahoo.com email, not *jacron* as seen in this screenshot:



Cpl. Faggert was able to find an app in the phone called "Secure Folder," which was passcode protected. Cpl. Faggert was unable to open the app at that time. However, two image files were located on the device that depicted an adult female wearing only skirt, naked from the waist up standing in a child's bedroom. The adult has her back turned and in front of her appears to be standing in front of a child. Sgt. Antal, through his training, knowledge and experience, believed the images were formatted in a way that they could have been part of a series depicting CSAM. Moreover, these images were not "selfies," in other words, a third unknown person was acting as the photographer.

On January 11, 2024, Sgt. Antal authored a second search and seizure warrant for Curl's cell phone so that law enforcement could try to access the secured folder and use other investigative techniques. *See* Def. Ex. G (ECF 47-7), Search Warrant for Curl's Phone 1/11/24. The warrant

was signed by the Honorable Joseph A. Riley of the District Court for Caroline County.   The "Secured Folder" was not able to be opened or accessed during this second search.

Sgt. Antal authored a third search and seizure warrant for Curl's cell phone, with the search date range of September 15, 2023, to present, which was again signed by the Honorable Joseph A. Riley on February 28, 2024. *See* Def. Ex.  H (ECF 47-8), Search Warrant for Curl's Phone 2/28/24. Investigators were able to locate the *jacron* email address within the device and determined that it was associated with Howeth, a contact within the device.



A text from "James Howeth" dated 12/15/23, the day Curl's phone was seized

Sgt. Antal then investigated Howeth and the *jacron* email address. Howeth used the *jacron* email address as his email in the registration documents through  Schools (▮▮▮▮). Sgt. Antal also learned that Howeth listed Curl as an emergency contact ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and that Howeth and Curl were romantically involved. Howeth's address through the MVA was ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Maryland (henceforth, the residence); Howeth also listed this address as his residence through ▮▮▮ .

Based on the relationship between Curl and Howeth, the use of *jacron* by Howeth, Howeth communicating with Curl's phone x4564, and the uploading of CSAM by *jacron* into a cloud storage associated with x4564, Sgt. Antal applied for and received a search and seizure warrant for Howeth's residence to include the seizure of digital electronics for purported violations of Md. Code Ann., Criminal Law, § 11-208, Possession of Child Pornography. Def. Ex. I (ECF 47-9), Residential Search Warrant.

Members of MSP executed the warrant on March 14, 2024, at approximately 5:30 a.m.[4] Howeth and others, ▮▮▮▮▮▮▮▮▮▮▮▮ , who were in the home were asked to come to a central area of the home, and were seated in the kitchen area while the residence was cleared.[5] No one was handcuffed at any time  Howeth was then escorted up to his bedroom so he could get some clothing; he was told that he would be brought outside so he and Sgt. Antal could talk. Sgt. Antal led Howeth to Sgt. Antal's vehicle to speak. They walked to Sgt. Antal's vehicle; Howeth

---

[4] This was three months after Howeth's girlfriend Ann Curl was questioned by MSP. Howeth was aware of that interview and that her phone had been taken by MSP.

[5] *See* Gov. Ex. 1, the Body Worn Camera (BWC) recording of the knock and entry. The Government will provide a thumb drive to Chambers.

entered the front passenger seat, and Cpl. Tilghman sat in the backseat.  Sgt. Antal gave Howeth

his *Miranda* rights, using a form that was initialed and signed by Howeth.[6]  Howeth agreed to

the interview.  The interview was recorded on body worn camera.[7]  During the interview,

Howeth state he knew that MSP was there because of the "poor choices" he made in the past and

that he was not "surprised."   Howeth also told Sgt. Antal that he had previously searched for

child pornography, that he had sent a file to Curl one time.  Curl told him to stop, so "that was

the end of it." Howeth said he did not search for child pornography again.   Howeth made many

other statements as well, including that he and Ann Curl had "fantasy conversations" about

sexually abusing children, including Minor Victim, and that while he used Minor Victim in

sexual texts and fantasy, he had never touched her before.  At no time did Howeth ask to speak

to an attorney.  At no time did Howeth as to stop answering questions.  At the end of the

interview, Howeth was arrested and charged with Sexual Child Abuse (Md. Ann. Code Crim. §

3-602), Possession of Child Pornography (Md. Ann. Code Crim. § 11-208), and Distribution of

Child Pornography (Md. Ann. Code Crim. § 11-207(a)(4)).  On-scene forensic previews were

done of the devices that had been located to determine which would be seized and later searched

pursuant to a separate warrant.

A search warrant was signed by the Honorable William H. Jones of the District Court for

Dorchester County on March 19, 2024, for the search of Howeth's seized devices.  Def. Ex. J

(ECF 47-10),  Devices Search Warrant.  Of particular interest, Howeth's two Samsung cell

phones were forensically downloaded and examined. On one phone, a Samsung Galaxy S9, 7

---

[6] *See* Gov Ex. 2 – Miranda Form

[7] Def. Ex. K (ECF 47-11) – the recorded interview from Sgt. Antal's BWC.  The Government will also provide a transcript prior to the Motions Hearing on February 4, 2026.

images were found – █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████  Approximately 1100 images of commercially available CSAM were found on Howeth's other cell phone, the Samsung S21. The image related to the Cybertip was also located.

On October 8, 2024, Judge Erin Aslan of the United States District Court for the District of Maryland granted a search and seizure warrant for the FBI to obtain photographs of Howeth's penis, left hand, feet, and the prone positioning of his body for comparison to the produced images ████████████████[8] Howeth, after reading the warrant and without any questions asked

---

[8] *See* Gov. Ex. 3 – Warrant for Photos of the Defendant

of him, told agents that the pictures on his phone have the exact same thing so he did not understand why the agents were executing this warrant.

## III. GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTIONS

The Government responds to each of the Defendant's pretrial motions to suppress evidence and request for a Frank's hearing, and to suppress statements, and respectfully requests that this Honorable Court deny the Defendant's motions.

### A. Defendant's Motion to Suppress Evidence and Derivative Evidence Obtained in Violation of the Fourth Amendment (ECF No. 47)

Howeth moves this Court to suppress evidence obtained and stemming from the search of his residence on March 14, 2023. As detailed below the search of the Howeth's residence and the search of seized devices are valid, and the Howeth's argument fails at every step of the analysis.

Howeth raises three grounds to as to why the March 14, 2023, search warrant was invalid. First, Howeth claims the search warrant failed to establish a nexus between the suspect criminal activity and the residence. Second, Howeth argues that the search warrant affidavit omits material facts such that the search warrant is void. Third, Howeth claims that the search warrant lacks particularity. Howeth is incorrect on all three grounds. Even assuming *arguendo*, that there was insufficient probable cause or any other errors in the affidavit (which there were not), the good faith exception applies because any reasonable officer would have relied on the sufficiency of the search warrants authorized by the state judge in this case. Howeth's motion to suppress evidence derived from the search warrant, and his request for a *Franks* hearing, should be denied.

### 1. There is a sufficient nexus between the residence and the criminal activity.

11

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., Amend. IV. Evidence obtained from Howeth's device seized from his residence should not be suppressed because the evidence was seized pursuant to facially valid search warrants, supported by probable cause, and issued by a neutral magistrate.

> In reviewing a search warrant application, a magistrate judge must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

"To begin with, warrant affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Clenney*, 631 F.3d 658, 665 (4th Cir. 2011) (internal citation and quotation marks omitted). A court reviewing a judge's assessment of probable cause must accord his or her decision "great deference," and should not "invalidate a warrant 'by interpreting [an] affidavi[t] in a hyper-technical, rather than a commonsense, manner.'" *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir.), *cert. denied*, 510 U.S. 983 (1993) (quoting *Gates*, 462 U.S. at 236). "So long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

A commonsense reading of the statement of probable cause contained in the residential affidavit, Def. Ex. I (ECF 47-9), demonstrate that the judge had a substantial basis for concluding the warrant was supported by sufficient probable cause. The affidavit set forth enough information

to form a considerable basis that a search would uncover evidence of wrongdoing—namely, that the initial residential warrant as well as the devices warrant would lead to evidence relating to the target offense of Possession of Child Pornography.

The law does not require a high level of evidentiary proof at the warrant-application stage. The law does require only that an affidavit demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Doyle*, 650 F.3d 460, 472 (4th Cir. 2011) (*quoting United States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983). That standard is amply satisfied here.

"Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. The probable cause standard does not require officers "to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause." *Taylor v. Farmer*, 13 F.3d 117, 121–22 (4th Cir. 1993). The probable cause standard is "not a high bar," *United States v. Blakeney*, 949 F.3d 851, 859–61 (4th Cir. 2020), and the highly specific details Howth demands are not required.

Here, the affidavit included the information from the Cybertip that one images of CSAM was uploaded to a Syncronoss cloud storage account related to the phone number x4564 and by email *jacron.* A description of that file was also provided, and it is clearly CSAM. Sgt. Antal described the results of the search warrant for the Syncronoss account and his interview of Curl. The image files found on Curl's phone are mentioned as well as the discovery of the *jacron* email

13

within Curl's phone and the identification of Howeth as the user of *jacron*, the email address that uploaded the CSAM file to Curl's Syncronoss account. Sgt. Antal described that Howeth listed Curl as an emergency contact in school documents and that the two were in a romantic relationship.

The warrant and its respective affidavit established sufficient probable cause to believe that evidence for the crime of Possession of Child Pornography, in violation of Md. Ann. Code, Crim. § 11-208, would be found in the residence of Howeth – specifically within the "computers, laptops, cellular telephones, tablets… any item that can be utilized for storing electronic data… and any media that contain child pornography, and additional evidence related to [Possession of Child Pornography]." Def Ex. I (ECF 47-9), at p. 1.

Sgt. Antal, as the affiant, provided his knowledge, training, and experience as well – namely that "individuals involved in possession of child pornography often obtain and maintain collections of this material on various types of electronic devices, such as cellular telephones, computers, etc." *Id.* at p. 7.

Howeth's argument is because Curl did not reside with Howeth, there is no connection, no nexus, between Howeth's email address *jacron*, Howeth's residence (the place to be searched), and the items to be seized (electronic devices and evidence of child pornography crimes). "The affidavit in this case simply failed to provide the necessary bridge between the suspected criminal activity and Mr. Howeth's residence." ECF 47, p. 21

Howeth relies on several cases that are wholly distinguishable. In the case *United States v. Doyle,* 650 F.3d 460 (2011), the Court held that a warrant affidavit did not provide a sufficient nexus between probable cause for Possession of Child Pornography and Doyle's home. Doyle was investigated for sexual assault of three children, and, during the investigation, a search

warrant for his computers was granted. That search warrant had a myriad of issues, the greatest of which was that the affiant failed to provide any information as to the specifics of "nude photos" being shown to a potential sexual assault victim and when these images were shown to the victim – "the argument is not that too much time elapsed but instead that there was insufficient evidence presented to the magistrate to determine how much time elapsed." *Id.* at 475. In other words, the court held, probable cause does not remain valid "ad infinitum." *Id.* *Doyle* is distinguishable from this case in that Sgt. Antal provided a date of when the CSAM file was uploaded from x4564 and *jacron* to the Syncronoss account: September 15, 2023. Sgt. Antal then tied *jacron* to Howeth, tied Howeth to Curl, and tied Howeth to the residence where his electronic devices would be found.

Similarly, Howeth cited *United States v. Lalor*, 996 F.2d 1578 (4th Cir., 1993*),* to support their position on nexus. *Lalor* involved a search warrant related to drug activity, which is a wholly different type of crime from the online and electronic possession of child pornography. "In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime but whether it is reasonable to believe that the items to be seized will be found in the place to searched." In that case, the court found that there was no information linking the criminal activity of drug distribution to the Lalor's home. Relatedly, Howeth also cites *United States v. Wilson,* 153 F.4th 478 (5th Cir. 20205) for the premise that no nexus could be found between the evidence of an assault at one location to the search of the target residence. However, in *Wilson*, the affiant did not provide any observations, inferences, or corroborated tips to link the assault (which occurred at a Waffle

House) with the residence, including no mention of any factual confirmation that Wilson lived in the residence they sought to search in the first place.

That is not the case here. Sgt. Antal linked the suspected email address *jacron* to the uploading of CSAM to an account belonging to Howeth's girlfriend Curl; Sgt. Antal linked Howeth to that email address through ███ records and through Curl's phone; Sgt. Antal linked Howeth to the residence; Sgt. Antal linked the electronic devices to be be seized to the storing of CSAM, like within an email account. It was reasonably believed and a fair probability that contraband would be in Howeth's residence. The inferences of where CSAM could be found and how it can be stored were also provided, all of which, under a totality of the circumstances links Howeth's residence, and the electronic devices therein, to evidence of a crime. The bridge, to use Howeth's phrase, was sufficiently built.

### 2. The Defendant is not entitled to a *Franks* hearing

Howeth's second ground for suppression is that Sgt. Antal omitted material facts that would have defeated any probable cause to search Howeth's residence. Howeth requests a *Franks* hearing in this regard.

In *Franks v. Delaware*, the Supreme Court set forth a two-step process for defendants seeking to challenge search warrant affidavits. 438 U.S. 154 (1978). First, a defendant must make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant. *Id.* at 155-56. Second, the allegedly false statement must be necessary to the finding of probable cause. Only if these showings are met will be a hearing be held at the defendant's request. *Id.* This showing "must be more than conclusory" and should include affidavit or other evidence." *Id.* at 171. As

for Howeth's allegations of omissions in this case, the *Franks* threshold is even higher. As stated by the court in *United States v. Clenney*, "[m]erely identifying factual omissions is insufficient. 631 F.3d 658, 664 (4th Cir. 2011). Howeth must show that the omissions were designed to mislead and were material to the finding of probable cause.

Howeth alleges that Sgt. Antal made a material omission by failing to include Curl's residential address in the affidavit. This fact "would have eliminated any purported connection between Howeth's residence and the suspected criminal activity." ECF 47, p. 23. The fact that Curl had a legal residence that was separate from Howeth's residence is hardly an omission, let alone a material one. Howeth, too, was the target of the investigation. By March 2023, Sgt. Antal connected Howeth to the email *jacron* from the Cybertip that uploaded the CSAM and then connected Howeth to Curl, the owner of the Syncronoss account from the Cybertip. Howeth listed Curl as an emergency contact in a record for DCPS and he was romantically linked to Curl. It was immaterial whether Curl resided at Howeth's residence or had her own separate residence. The connection being sought is that email *jacron* uploaded a CSAM file that ended up on a Syncronoss cloud storage account and determining where that file, and likely other CSAM files like it, were stored.

Sgt. Antal did not falsely state that Curl resided with Howeth or that the two had the same information within the ████ records. In fact, Sgt. Antal wrote that Howeth listed Curl on a ████ contact list as an emergency contact as a further tie to the closeness of their relationship. Howeth listed the target address as his residence with ████. Those two facts are distinguished from one another and, when read together, do not mislead that Curl lived at Howeth's residence. Howeth seems to argue that Curl was the only suspect, when there was a reasonable conclusion

to be made that Howeth was also a suspect.  Sgt. Antal did not yet have an "airtight cases before taking action"[9] but he was not required to.  Curl's address, included or omitted, had no effect on the probable cause to search Howeth's residence.  There is no evidence that Sgt. Antal had the requisite intent to mislead or that he exhibited a flagrant police action.  This omission falls well short of what *Franks* was designed to prevent.  *See United States v. Colkley,* 899 F.2d 297 (4th Cir. 1990).

Howeth fails to make a substantial preliminary showing that a material omission was made in the affidavit with the intent to mislead the reviewing judge.

### 3.  There is sufficient particularity between the warrant and the criminal activity

Howeth argues that the residential warrant failed to satisfy the particularity requirement of the Fourth Amendment.  He argues that the warrant unlawfully granted law enforcement with "unfettered discretion" to conduct a 'preview' and 'analyze' electronic devices found at the residence." ECF 47 at p. 33

Sgt. Antal and investigators arrived at the Howeth's residence where several other people lived who, presumably, also own electronic devices but are not suspected of child pornography crimes.  The search warrant allowed for the seizure of digital devices, mainly computers and cell phones, to later search for evidence of the crime of Possession of Child Pornography and related charges.  While on the scene, members of the investigative team conducted on-scene forensics and previewed the devices before seizing them.  This is done to ensure the devices belonged to

---

[9] Taylor v. Farmer, 13 F.3d 117, 121-22 (4th Cir. 1993)

Howeth and/or had some evidence of CSAM before being seized and brought back to the forensic lab.

It is true that the purpose of the particularity requirement is to prevent the "general exploratory rummaging in a person's belongings" that occurs when a warrant is too general. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). Particularity does "forbid fishing expeditions while simultaneously preserving the flexibility of law enforcement to adapt to unforeseen circumstances that arise in an investigation predicated on incomplete information." *United States v. Dargan*, 738 F.3d 643,547 (4th Cir. 2013). One such unforeseen circumstance is the presence of multiple household member and the potential of other devices that may not belong to Howeth or contain the fruits of the crime. Previewing devices is not unreasonable. Conducting on-scene forensics examinations is not unreasonable. "As always, the ultimate touchstone of the Fourth Amendment is reasonableness." *United States v. Cobb*, 970 F.3d 319, 327 (4th Cir. 2020). Moreover, the search warrant was confined to searching for evidence and the fruits of the crime of Possession of Child Pornography – even in conducting "previews" of the devices, law enforcement was bound by that parameter.

Sgt. Antal, after the preview of the devices to determine preliminary information about them, authored a final warrant in this case in order to search the devices that were seized from Howeth's residence. Def. Ex. J (ECF 47-10), Warrant for Devices, 3/19/24.

Here, there was no general, exploratory rummaging in the Howeth's belongings. Rather, the warrant laid out specific facts establishing probable cause to believe that the residence where Howeth lived would contain electronic devices that contain evidence of Possession of Child Pornography because of Howeth's use of *jacron*. The preview of the devices, as permitted by

19

the warrant, allowed investigators to focus on the devices belonging to Howeth or that stored CSAM. Those devices were then seized so that a search warrant for those devices could be obtained.

Even assuming *arguendo* that the search warrant was overbroad or lacking in particularity, the doctrine of inevitable discovery would render the evidence from the devices admissible. *Nix v. Williams*, 467 U.S. 431 (1984). Sgt. Antal sought and received a separate warrant for the devices that were seized from Howeth's residence. These devices had been previewed and analyzed on scene to help determine if they were related to Howeth and criminal activity. The seized devices were always going to be searched by way of a separate warrant. Any of the images, videos, relevant texts, or other evidence that may have been seen during the preview of the devices on scene would have inevitably been found during the digital forensic examination that was done by the examiner in this case. *See United States v. Souza*, 223 F.3d 1197, 1206 (10th Cir. 2000) (Police illegally opened a UPS package that contained drugs but it was held that that evidence was admissible under inevitable discovery because the officer "would have obtained a warrant" had the illegal search not occurred).

### 4. In the alternative, the good faith exception applies, and suppression is unwarranted.

Even if the Court holds that a Fourth Amendment violation occurred, the good faith exception to the Fourth Amendment's exclusionary rule, as set forth in *United States v. Leon*, 468 U.S. 897 (1984), applies here. In *Leon*, the Supreme Court explained, "[i]f the purpose of the [Fourth Amendment's] exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional

under the Fourth Amendment." 468 U.S. at 919 (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)). The exclusionary rule serves to deter "deliberate, reckless, or grossly negligent conduct." *Herring v. United States*, 555 U.S. 135, 144 (2009). Thus, to trigger the exclusionary rule, an officer's misconduct must be sufficiently deliberate that suppression could deter it; the court must also conclude that deterrence is worth the substantial cost of exclusion. *Id*. The test is whether "a reasonable, well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Brown*, 951 F.2d 999, 1004 (9th Cir. 1991) (internal citations omitted).

In this case, the MSP reviewed the CSAM file from the Cybertip. MSP then authored subsequent search warrants and initiated their investigation, Sgt. Antal and others reasonably believed that Howth used *jacron* to upload a file of CSAM to the cloud account used by his girlfriend. Sgt. Antal then applied for and sought the residential warrant and subsequent electronics warrant from a neutral and detached magistrate, in this case Dorchester County District Court Judge William H. Jones. The warrants were each granted, and Sgt. Antal and MSP relied on those warrants in good faith.

When officers seize evidence in good faith in reliance on a facially valid warrant issued by a judge, and the affidavit is later found to lack probable cause, the evidence is not subject to exclusion. *See United States v. Leon*, 468 U.S. 897 (1984) (affidavit of experienced narcotics officer who acted in reliance on information provided by informant of "unproven reliability" held to lack probable cause, but evidence seized by agent who acted in good faith reliance on the facially valid warrant was not subject to suppression); *see also United States v. Edwards*, 798 F.2d 686, 690 (4th Cir. 1986). When applying the good faith exception, courts "should examine the totality

of the information presented to the magistrate in deciding whether an officer's reliance on the warrant could have been reasonable." *United States v. Legg*, 18 F.3d 240, 244 n.1 (4th Cir. 1994).

There are "four situations in which an officer's reliance on a search warrant would not be reasonable," that is, where the "good faith exception" would not apply: (1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth; (2) the magistrate wholly abandoned his detached and neutral judicial role; (3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid. *United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995) (*quoting Leon*, 468 U.S. at 923). Howeth has not, does not and cannot to point to any of these four exceptions to a *Leon* good faith exception. The warrants are valid, and, even if for some reason this Court believes they are not, the warrants were relied upon in good faith. Thus, the seized evidence is not subject to the exclusionary rule and is admissible.

**B.      Motion to Suppress the Defendant's statements (ECF No. 50)**

Howeth argues that any statements in connection with this investigation were involuntary and should therefore be suppressed. Howeth identifies three different statements in this matter: (1) his March 14, 2024, Mirandized statement to Sgt. Antal; (2) his interview with the Department of Social Services (DSS), and (3) his statements to FBI Agt. Jeffrey Yesensky and Agt. Grace Meyer on October 8, 2024. The Government will not be introducing Howeth's statement to the

DSS caseworker from May 6, 2024. The purpose of that interview is to ensure of the safety of children from a DSS standpoint, i.e. the creation of safety plans, custody issues, etc. It would have a chilling effect on the pivotal role of DSS investigative interviews and impact on the safety of children if the Government used that statement in a criminal case. That aspect of Howeth's motion is, therefore, moot. The Government will only address the two statements to law enforcement officers in this response.

### 1. Interrogation by Sgt. Antal on March 14, 2024

Howeth argues that his statements during his interrogation were involuntary; the basis seems to be that Howeth's will was overborne. Howeth goes on to argue that because Howeth had no criminal history and a "first time participant" with the criminal justice system, renders his statements involuntary. ECF 47 at p. 5. Additionally, Howeth, who was 40 years at the time, argues because he woken from sleep and then separated from his family for the duration of the interview that morning, his *Miranda* waiver is somehow invalid. This is preposterous and not supported by the facts and circumstances surrounding the interrogation captured on Sgt. Antal's body worn camera.[10]

### a. Applicable law

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In order to protect this right, the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) adopted prophylactic procedural rules that must be followed in custodial interrogations. *United States v. Parker*, 262 F.3d 415 (4th Cir. 2001). In general, any statements elicited from a suspect without first advising the suspect of

---

[10] Def Ex. K (ECF 47-11) and Gov Ex. 1, BWC from the entry and the interview.

his rights to remain silent and to counsel are inadmissible in the prosecution's case-in-chief. *Id.* An individual is "in custody" for *Miranda* purposes when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). "Interrogation" for *Miranda* purposes means "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). On the other hand, "volunteered statements"—that is, statements "given freely and voluntarily without any compelling influences"—"are not barred by the Fifth Amendment and their admissibility is not affected by" the Supreme Court's holding in *Miranda*. *Miranda*, 384 U.S. at 478.

Statements made after a *Miranda* waiver must also be voluntary. The Supreme Court has held that "[c]oercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see also United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002). Examples of coercive police activity include prolonged detention and interrogation without sleep or rest, administration of "truth serums," physical abuse, and threats of physical abuse. *See Cristobal*, 293 F.3d at 140. "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc). Rather, "[t]he proper inquiry 'is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired'" by police conduct. *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)); *see also Braxton*, 112 F.3d at 780. In applying this test, "courts must consider the 'totality of the circumstances,' including the characteristics of the defendant, the

setting of the interview, and the details of the interrogation.'" *Braxton*, 112 F.3d at 780 (quoting *Pelton*, 835 F.2d at 1071). Ordinarily, courts do not suppress post-*Miranda* statements unless they are "coerced confessions procured by means 'so offensive to a civilized system of justice that they must be condemned.'" *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (quoting *Miller v. Fenton*, 474 U.S. 104, 109 (1985)).

### b. Relevant facts[11]

The interrogation of the Howeth occurred in the front seat of Sgt. Antal's car just outside of the Howeth's home: Howeth was unhandcuffed and was allowed to walk to and enter the car by his own fruition. Prior to the interrogation, Howeth was allowed to go into his room to get clothing and use the bathroom.[12] Howeth's statements were preceded by a proper *Miranda* advisement and a knowing and voluntary of those rights.[13] After being properly advised, Howeth indicated he understood his rights and agreed to answer questions. Howeth initialed the *Miranda* form and signed it. At no time did Sgt. Antal make any threats or promises to induce Howeth to waive his rights. In fact, Sgt. Antal specifically asked Howeth to confirm that Sgt. Antal had not threatened or coerced him to answer questions, and that Howeth was not under any duress.[14]

### c. The Defendant's Statements Followed a Valid *Miranda* Waiver.

Howeth's statements from March 14, 2024, were voluntary. There are no circumstances indicating that Howeth's "will [was] overborne or [that] his capacity for self-determination [was] critically impaired." *See Braxton,* 112 F.3d at 780 (quoting *Pelton,* 835 F.2d at 1071). Howeth

---

[11] The Government avers that the BWC provides the most accurate version of facts without subjective commentary.
[12] Def. Ex. K (ECF 47-11), at 5:55.
[13] Gov. Ex. 2, Miranda Form
[14] Def. Ex. K (ECF 47-11) at 12:45 to 15:00.

was legally detained and properly advised of his rights. Members of MSP and Sgt. Antal in particular, were cordial and professional; Sgt. Antal did not make any threats or promises or otherwise engage in coercive conduct. *See Connelly*, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a [statement] is not 'voluntary' within the meaning of the Due Process Clause."). Howeth was not forcibly awakened by police officers in his room or jostling him awake, yelling in his face or pointing firearms at him. This is not a case where law enforcement officers "attempted to 'wring a confession out of an accused against his will,'" *Cristobal*, 293 F.3d at 141 (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206–07 (1960)), or "went to extraordinary lengths to extract from [the defendant] a confession by psychological means," *Braxton*, 112 F.3d at 786 (quoting *Ferguson v. Boyd*, 566 F.2d 873, 877 (4th Cir. 1977) (per curiam)). The interview was conversational, respectful, and voluntary.

In sum, the custodial interview in this case was routine, cordial, and free from improper police influence. All statements at issue were preceded by valid *Miranda* waiver. The totality of the circumstances weighs heavily in favor of a finding of voluntariness. Accordingly, Howeth's Motion to Suppress Statements, as to the March 14, 2023, interrogation, should be denied.

**2. The Defendant's Statement to Agt. Yesensky on October 8, 2024**

Howeth claims that his statements to FBI Agents Jeff Yesensky and Grace Meyer were in violation of his Miranda rights. Miranda applies to custodial interrogations. Here, Howeth was in custody, but he was never interrogated. Howeth's statements are therefore admissible

**a. Applicable law**

An "interrogation" for *Miranda* purposes means "words or actions on the part of the police . . . that the police *should know are reasonably likely* to elicit an incriminating response from the

26

suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (emphasis added). On the other hand, "volunteered statements"—that is, statements "given freely and voluntarily without any compelling influences"—"are not barred by the Fifth Amendment and their admissibility is not affected by" the Supreme Court's holding in *Miranda*. *Miranda*, 384 U.S. at 478. Casual conversation or statements of agents about evidence which were not designed to elicit an incriminating response are not interrogation for Miranda purposes. *See United States v. Payne,* 954 F.2d 199 (4th Cir. 1992). Advising a defendant, who has invoked his right to counsel, about the charges against him, is not the functional equivalent of an interrogation. *See United States v. Blake,* 571 F.3d 331 (4th Cir. 2009) (Defendant's incriminating statements admissible even after he was advised of the charges, including that he was facing the death penalty, and the detective said, "bet you want to talk now.") Reading a search warrant to a defendant is also not an interrogation. *United States v. Smith* (2023 WL 22624). While the weight of the information being offered to a suspect might cause that suspect to speak, "the mere provision of information does not amount to an impermissible "psychological ploy." *Id. (*quoting *Easley v. Frey*, 433 F.3d 969, 973 (7th Cir. 2006)).

### b. Relevant facts

FBI Agents Jeff Yesensky and Grace Meyer met with Howeth at the Dorchester County Detention Center (DCDC) on October 8, 2024, with a search warrant to take photographs of certain parts of the Howeth's body. *See* Gov. Ex. 3, Search Warrant for Photos of Defendant. The warrant included the premise that only a male, here Agt. Yesensky, would be present to take the permitted photographs, unless any detention center personnel needed to be present for liability purposes. Further, the warrant required that the photos be taken in a private area of DCDC, away

27

from the view of other inmate, guards, or personnel. *Id.* at p. 11. Both agents were initially present, and Agt. Meyer advised the Howeth about the existence of the warrant and explained their presence and what they intended to do in terms of executing the warrant. Howeth was given an opportunity to read the warrant. At no time was Howeth asked any questions. *See* Def. Ex. 4 (ECF 50-4), FBI Memorandum. Howeth then said that the pictures on his phone have the exact same thing, so he did not understand why the agents were doing the search warrant. The agents told Howeth that they could not talk to him without his attorney present, but if he wanted to talk, Howeth could talk to his attorney and arrange that. Agt. Meyer then left the room so that the photos could be taken in relative privacy.

### c. The Defendant's statements were voluntarily made.

Howeth's statement during the execution of the search warrant on October 8, 2024, were not a result of an interrogation and are therefore admissible. Agt. Yesensky and Agt. Meyer, merely informed Howeth their purpose for meeting with him and allowed him to read the warrant. The words and actions of the agents did not make it "reasonably likely to elicit an incriminating response" from the Howeth. *Innis*, *id.* No psychological ploy was at play. Neither agent asked a question of Howeth, and in fact, after Howeth spoke, they advised him that they could not speak to him about the case without his attorney present. Howeth's statements were voluntary and not a result of an interrogation. Accordingly, Howeth's Motion to Suppress Statements, as to the October 8, 2024, should also be denied.

### IV. CONCLUSION

Wherefore, the Government respectfully requests that this Court deny Defendant's motions to suppress evidence and suppress statements and deny the request for a *Franks* hearing.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By:                           

Colleen Elizabeth McGuinn
Assistant United State Attorney

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing document was served electronically via ECF to counsel of record for the Defendant as well as sent via email.

Colleen Elizabeth McGuinn
Assistant United States Attorney

29