IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

JAMES EDWARD HOWETH

*Defendant*.

**UNDER SEAL**

Criminal No.:  ELH-24-0311

**MEMORANDUM OPINION**

In this child sexual exploitation and child pornography case, the Court addresses motions to suppress as well as a *Franks* motion filed by James Edward Howeth, defendant.  *See Franks v. Delaware*, 438 U.S. 54 (1978).[1]

Howeth was indicted on October 24, 2024 (ECF 1) and charged with one count of sexual exploitation of a child, in violation of 18 U.S.C. § 2251(a), and two counts of possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B), 2252A(b)(2), and 2256.  A Superseding Indictment followed on September 10, 2025.  ECF 42.

In particular, Count One alleges that on or about April 21, 2022, defendant induced, enticed, and coerced a prepubescent minor female to engage in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), for the purpose of producing visual depictions of such conduct, in violation of 18 U.S.C. § 2251(a).  In connection with the offense, seven image files were allegedly stored on a Samsung Galaxy S9 cell phone.  Count Two charges that on March 14, 2024, defendant was in possession of child pornography, as defined in 18 U.S.C. § 2256(8), produced and stored on the same cell phone, in violation of 18 U.S.C. §§ 2252A(a)(5)(B), 2252A(b)(2), and 2256.

---

[1] Defendant has also filed motions in limine.  ECF 84, ECF 85.  However, they are not addressed here.

Count Three also charges possession of child pornography on March 14, 2024, but with respect to a Samsung Galaxy S21 5g cell phone.

The indictments followed a search of defendant's home on March 14, 2024.  The search was conducted by members of the Maryland State Police, pursuant to a search warrant issued on March 13, 2024, by a judge of the Circuit Court of Maryland for Dorchester County.[2]

Howeth has moved to suppress evidence recovered in connection with the search of his residence.  ECF 47 (sealed); ECF 54 (unsealed).  The motion is supported by numerous exhibits.  ECF 47-2 (collectively with ECF 47, "Search Motion").  In addition, defendant has moved to suppress statements that he made on March 14, 2024, May 6, 2024, and October 8, 2024.  ECF 50 (sealed); ECF 53 (unsealed).  The defense also submitted several exhibits.  *See* ECF 50-2 (collectively with ECF 50, "Statements Motion").[3]  In addition, Howeth has requested a *Franks* hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and its progeny.  ECF 47, ECF 54,

---

[2] Defendant was arrested on March 14, 2024, and charged with various State offenses.  Those charges were dismissed after defendant was federally charged.

[3] Unfortunately, the defense exhibits were docketed collectively, under seal, as one exhibit, both for the Search Motion, ECF 47-2, and for the Statements Motion, ECF 50-2.  But, the government cites to the exhibits as if they have individual ECF numbers.  *See*, *e.g.*, ECF 58 at 3.

Redacted versions of defense exhibits for the Search Motion appear at ECF 65 (Defense Exhibit A); ECF 66 (Defense Exhibit C); ECF 67 (Defense Exhibit D); ECF 68 (Defense Exhibit E); ECF 69 (Defense Exhibit F); ECF 70 (Defense Exhibit G); ECF 71 (Defense Exhibit H); ECF 72 (Defense Exhibit I); ECF 73 (Defense Exhibit J); ECF 74 (Defense Exhibit L); and ECF 75 (Defense Exhibit B).  Defense Exhibit B is the Body Worn Camera interview of Ann Curl.  Defense Exhibit K, referenced at ECF 47-2 at 97, is the Body Worn Camera interview of defendant.  The government provided a transcript of Howeth's interview but did not docket it.

For the Statements Motion, redacted versions of the exhibits are found at ECF 62 (Exhibit A); ECF 63 (Exhibit B); ECF 66 (Exhibit C); and ECF 64 (Exhibit D).  I have not located redacted versions of ECF 50-2 at 11 and ECF 77-1, which appear to be the same document.

The government filed a consolidated opposition. ECF 58 (sealed); ECF 59 (unsealed). The government also submitted several exhibits. ECF 58-1, ECF 58-2, ECF 58-3. In its submission, the government represents that at trial it does not intend to introduce defendant's statement of May 6, 2024. So, that statement is no longer in issue.

The defendant replied. ECF 82 (redacted); ECF 99 (sealed). He also submitted supplemental authority. ECF 83.[4]

In sum, defendant maintains that the search warrant fails to establish probable cause to search defendant's residence, thereby rendering the search unconstitutional. ECF 47 at 1. In particular, Howeth claims that the search warrant failed to establish the requisite nexus between the suspected criminal activity and defendant's residence. *Id.* at 1, 13. Further, Howeth contends that the search warrant fails to satisfy the particularity requirement of the Fourth Amendment. *Id.* at 2, 14. In addition, Howeth contends that the affidavit in support of the search warrant omitted two material facts concerning Ann Curl, defendant's girlfriend: 1) Curl was the source of the child pornography, and 2) Curl did not live with defendant. *Id.* at 2, 13-14. Therefore, he contends that a *Franks* hearing is warranted. *Id.*

As to defendant's statements, Howeth contends that his statements to law enforcement on March 14, 2024, were involuntary and obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). ECF 50 at 3. With respect to the statement of the defendant on October 8, 2024, defendant again argues that his *Miranda* rights were violated. *Id.* at 11. Moreover, because defendant had a lawyer at that time with respect to related State charges, he maintains that the government violated his rights under the Sixth Amendment. *Id.* at 12.

---

[4] In the Memorandum Opinion, when citing to the briefs, I primarily cite the parties' sealed submissions.

The Court held a hearing on February 4, 2026, at which both evidence and argument were presented. The transcript was docketed on March 30, 2026. ECF 97. Trial is scheduled for May 11, 2026. ECF 40.

On April 1, 2026, I issued an Order denying the motions. ECF 101. In the Order, I stated that a Memorandum Opinion would follow, setting forth the reasons for my Order. Accordingly, this Memorandum Opinion provides the grounds in support of my Order of April 1, 2026.

## I.    Factual Summary[5]

The National Center for Missing & Exploited Children ("NCMEC")[6] received a Cyber Tipline Report ("Cybertip") on September 15, 2023, from Verizon Synchronoss Technologies, Inc. ("Synchronoss") with respect to "Apparent Child Pornography." ECF 47-2 at 2. Synchronoss is a cloud-based storage provider for content stored on the Verizon Cloud. *Id.* at 4. The Cybertip involved a "Prepubescent Minor," *id.* at 5, 6, and included a description of apparent child pornography. The government refers to the material as "Child Sexual Abuse Materials" or "CSAM." *See*, *e.g.*, ECF 58 at 2, 3. The CSAM was reportedly uploaded utilizing a wireless telephone with the phone number of 410-490-4564. ECF 47-2 at 5, 6, 7, 8. The cellular carrier is identified as "Verizon Wireless." *Id.* at 7.

---

[5] In crafting the factual summary, I have relied on the evidence introduced at the hearing on February 4, 2026, including the testimonial evidence. I have also considered the many exhibits submitted by the parties with their briefs. *See*, *e.g.*, ECF 97 at 103.

In the government's brief, when recounting the facts, the government sometimes omits citations to exhibits. *See*, *e.g.*, ECF 58 at 4-5 (discussing alleged statements of Curl on December 15, 2023, without citation to exhibits); *id.* at 5-6 (discussing, without citation, the actions of Cpl. Faggert); *id.* at 7 (referencing recovery of email address of jacron09@gmail.com within Curl's phone, but without citation to the record).

[6] NCMEC was created in 1984 "to serve as a national clearinghouse and resource center for families, victims, private organizations, law enforcement, and the public on missing and sexually exploited child issues." ECF 47-2 at 2.

The Cybertip identified a suspect, Ann Curl.  *Id.*  In addition to specifying Curl's name and a telephone number for her, associated with the upload of CSAM, the Cybertip provided an email address of jacron09@gmail.com ("jacron email").  *Id.*  It also provided Curl's residential address on Bee Tree Road in Henderson, Maryland.

The Cybertip was designated Cybertip 174159863.  *Id.* at 2.  It was referred to the Maryland State Police ("MSP") on October 23, 2023.  ECF 58 at 2.  Thereafter, Detective Sergeant Theodore Antal of the MSP began an investigation.

On November 29, 2023, Sergeant Antal submitted an application for a search warrant for the Synchronoss account with respect to the Verizon account for phone number 410-490-4564 (hereafter sometimes referred to as "4564").  ECF 47-2 at 11-19.  The search warrant sought all subscriber information, including but not limited to photographs, videos, documents, and text messages associated with Cybertip 174159863 and the telephone number ending in 4564.  *Id.* at 18-19.

In support of the application for the search warrant, Sergeant Antal averred, in part, *Id.* at 16:

1) On October 23, 2023, Your ***AFFIANT*** from the Maryland State Police Criminal Enforcement Division Eastern Region (CEDER) was assigned a NCMEC (National Center for Missing and Exploited Children) cybertip number 174159826 for investigation. The cybertip was submitted by the online social media provider Synchronoss Technologies, Inc.

2) Synchronoss Technologies, Inc reported on September 15, 2023 at 21:06:11 UTC, a user of their platform uploaded 1 image of child pornography to their network. Your ***AFFIANT*** viewed the images and confirmed them to be child pornography

3) Synchronoss Technologies, Inc provided a phone number, 410-490-4564, for the use of the upload. The telephone number comes back to Verizon Wireless as the service provider. A subpoena was issued to Verizon to better identify the target

On November 29, 2023, Judge William H. Jones, of the Circuit Court of Maryland for Dorchester County, approved the search warrant application. *Id.* at 19.

Sergeant Antal obtained the results of the search warrant and reviewed the content of the Syncronoss account associated with 4564. It contained a photograph of the driver's license belonging to Ann Margaret Curl. ECF 47-2 at 21. The account also showed a photograph of a black and brown dog performing oral sex on a woman; a black and brown dog in a vehicle with Curl; and a "41-second video depicting a brown and black dog being ordered and performing oral sex on a human female." *Id.*[7]

Thereafter, on December 15, 2023, Sergeant Antal conducted an interview of Curl. The interview took place in Antal's police vehicle. ECF 47-2 at 23 ("Incident Narratives"). Antal's interview of Curl is captured on Antal's body worn camera. *See* ECF 47-2 at 10.[8]

At the outset of the interview, Curl was advised of her rights pursuant to *Miranda*, 384 U.S. at 436, and she agreed to waive them. ECF 47-2 at 23. She confirmed that the phone number 401-490-4564 belongs to her and that she has a Verizon account. *Id.* Antal explained to Curl that her phone was identified as the source of child pornography that was uploaded to the Synchronoss account. *Id.*

Antal showed Curl a "sterilized" version of the CSAM from the Cybertip. *Id.* Curl "stated that she had not seen the photo before." *Id.* Curl also denied that she views CSAM. *Id.* When asked if there was any CSAM on her phone, Curl said "no" but that "someone may have texted

---

[7] In Maryland, sexual contact between a human and an animal is a violation of Md. Code (2021 Repl. Vol.), § 10-606 of the Criminal Law Article.

[8] Defendant's "Exhibit B" is the recorded interview of Curl. For the convenience of the Court, the government also provided a transcript that is not docketed.

her a picture before." *Id.* Curl was also asked about the bestiality images. She responded that it was "'a stupid thing to do'" but that she "did it because she was curious." *Id.*

Pursuant to Antal's request, Curl "handed" her purple, Samsung cellular phone to Antal, and told him her "pass-code to unlock the phone." *Id.* Antal told Curl that he "would be seizing her cellular phone pending a search warrant to access the content inside." *Id.* The serial number of the phone ends in A5BB. *Id.* Curl was not arrested or charged. *Id.*

On December 18, 2023, Antal authored an application for a search warrant as to Curl's cellular phone for the period September 15, 2023 (the date of the Cybertip) to the date of seizure of Curl's phone on December 15, 2023. ECF 47-2 at 23; ECF 47-2 at 24-35. In support of the application, Antal averred, in part, that the MSP received the Cybertip from NCMEC on October 23, 2023. *Id.* at 28. And, he stated that CSAM was uploaded to the phone number ending in 4564, depicting a female "believed to be under the age of 8, fully nude in a sexual position on a bed engaging in oral sex with an adult male erect penis." *Id.*

In the warrant application, Antal also reviewed the information he had obtained from the warrant previously issued to Synchronoss for the phone with the number ending 4564. He also included some of the information he had obtained from his interview of Curl. *Id.* at 29. Judge Joseph A Riley, of the District Court of Maryland for Caroline County, signed the warrant on December 18, 2023. *Id.* at 31.

According to the government, Cpl. S. Faggert conducted the search of Curl's cell phone at the Talbot County Sheriff's Office, Criminal Investigations Division. ECF 58 at 5. The email

associated with the phone was found to be to a Yahoo.com email address, not the jacron email included in the Cybertip.[9]

The government recounts that Cpl. Faggert found a passcode-protected App in the phone called "Secure Folder," which he could not open. *Id.* at 6. However, two image files were located on the device. They depicted a female naked from the waist up, in a child's bedroom, appearing to be standing in front of a child, with a third person as the photographer. *Id.*

Sgt. Antal authored additional search warrants on January 11, 2024, and February 28, 2024, both of which sought to conduct forensic data analysis of Curl's cell phone. *See* ECF 47-2 at 36, 46; ECF 47-2 at 51, 54. On February 28, 2024, in the Affidavit in support of the search warrant, Antal averred, *inter alia*, that, during the execution of an earlier search warrant, he observed that "the cellular device" had "a folder labeled 'secured folder.'" ECF 47-2 at 59. He also stated that the folder was "password protected" and could not be accessed. *Id.* But, he claimed that investigators have "advance[d] tools to extract the data from the secure folder . . . ." *Id.* Judge Joseph Riley, of the District Court for Caroline County, approved both warrants. *Id.* at 46 (1/11/24); ECF 54 (2/28/24).

According to the government, investigators located the jacron email address within Curl's device. ECF 58 at 7. The government included in its brief a screenshot of Curl's cell phone from December 15, 2023, which shows Howeth as a contact. *Id.*[10] Moreover, Sergeant Antal learned that Howeth used the jacron email address in registration documents with the Dorchester County

---

[9] The government included a screenshot of Curl's phone in its brief. ECF 58 at 6. But, it was not appended as an exhibit to the brief. Nor was the screenshot introduced as an exhibit at the motions hearing.

[10] The screenshot was not appended to the government's brief as an exhibit. Nor was it introduced as an exhibit at the motions hearing.

Public Schools ("DCPS"). ECF 58 at 8. In addition, DCPS records reflect that Howeth listed Curl as an emergency contact for his daughter, who was born in July 2016. *Id.* Antal also learned that Howeth and Curl were in a romantic relationship. *Id.*

Investigators obtained defendant's residential address from the Maryland Motor Vehicle Administration and from DCPS. *Id.* The MSP learned that defendant resides on Neptune Drive in East New Market, Maryland (the "Residence"). *Id.*; *see* ECF 47-2 at 74.

On March 13, 2024, Antal applied for a search warrant for the Residence. ECF 47-2 at 67. The warrant application is supported by his Affidavit. *Id.* at 70-76. In the Affidavit, Antal reviewed his training in law enforcement. *Id.* at 71-72. He graduated from the MSP Academy in January 2005 and has been a member of the MSP since mid 2005. *Id.* at 70. He completed instructional training in many areas, including sex offenses. *Id.* In 2008, Antal completed sixteen hours of instruction on interviews and interrogations, including for victims of sexual assault. *Id.* at 71. Antal also completed instruction on other topics throughout 2011, 2012, and 2013. *Id.* at 71-72. Although there is no indication that Antal had instruction in regard to sexual child abuse cases, he claimed to have "conducted as well as assisted in numerous detailed investigations dealing," *inter alia*, with "child abuse." *Id.* at 72.

In addition, Antal recounted the factual information set forth in his prior search warrant affidavits. *Id.* at 72-74. For example, he related that MSP received the Cybertip from NCMEC on October 23, 2023, and it concerned "one image" depicting "Child Sexual Abuse Material" that was "uploaded" on September 15, 2023, to a Synchronoss account using phone number 410-490-4564 and the email address of jacron09@gmail.com. *Id.* at 72. Antal represented that he reviewed the image and he described it. *Id.* at 72-73.

Further, Antal recounted that on November 29, 2023, he obtained a search warrant associated with the Synchronoss account, and he related what it revealed, including information pertaining to Curl. *Id.* at 73. Antal also averred that he conducted a recorded interview of Curl on December 15, 2023. *Id.* He noted that Curl confirmed that the phone number ending in 4564 belongs to her and that she also has a Verizon cellular account.

Antal also related that on December 20, 2023, he obtained a search warrant for Curl's cell phone. *Id.* He described what was recovered, stating, *id.* at 73-74:

> On December 20th, 2023, your Affiant authored and executed a search and seizure warrant for the purple Samsung cellphone with serial number R5CW21AA5BB. While analyzing the data from the cellular device two photos were observed and are described as the following:

> Unknown adult person in what appears to be in a child's bedroom in a skirt and nude from the waste up with their back towards the camera. Investigators believe that the photo may depict a child in front of the adult. To your Affiant and other investigators [sic] experience, it is believed that the way the photos are formatted that the photos may be a part of a series of photos that could depict child pornography.

The Affidavit also recounts that on February 29, 2024, "the Maryland State Police Computer Crimes" executed a search and seizure warrant for the cellular device "using advance[d] forensics." *Id.* at 74. During the examination, "they determined that the email address 'jacron09@gmail.com' is the email address associated with a James Edward Howeth." *Id.* The Affidavit continues, *id.*:

> Through investigations conducted by your Affiant it was discovered that James Howeth listed that email address as his email address with the Dorchester County School system. Through the investigation Your Affiant has learned that Ann Curl and James Haweth [sic] have a romantic relationship. Additionally, James Howeth listed Ann Curl on a Dorchester County School contact list as a [sic] emergency contact.

> A search of the Motor Vehicle Administration database showed an address of 4302 Neptune Drive, East New Market, Dorchester County, Maryland for James Howeth. Additionally, James Howeth used that address as his residence with the Dorchester County Schools.

In addition, Antal averred, *id.* at 74:

> Your Affiant knows through knowledge, training, and experience those individuals involved in the possession of child pornography often obtain and maintain collections of this material on various types of electronic devices, such as cellular telephones, computers, tablets, gaming consoles. The individual is able to store, conceal, and access large amounts of data relating to child pornography in this way.

> Your affiant knows through knowledge, training, and experience those individuals involved in the possession of child pornography often store this material on various types of electronic storage devices such as compact disks, DVDs, floppy disks, USB flash drives, hard drives (internal/external), due to the ability to easily store and conceal these items to evade detection from those around them and from law enforcement.

> Your Affiant knows that various electronic devices can be seized by investigators to further their investigations. The data that are contained within these electronic devices can be retrieved by trained and qualified law enforcement personnel to confirm or rule out the further possession of child pornography. This can also determine if the individual is involved in the distribution or manufacturing of child pornography.

Judge Willam Jones, of the Circuit Court for Dorchester County, approved the warrant at 5:37 p.m. on March 13, 2024. ECF 47-2 at 79; *see id.* at 76. Of relevance, Judge Jones also authorized the MSP "to seize, preview, and analyze" electronic devices found at the Residence. *Id.* at 78.

The MSP executed the search warrant the next day, beginning at approximately 5:30 a.m. The record includes the body worn camera of Sgt. Antal (defense Exhibit K, ECF 47-2 at 97; government Exhibit 1, ECF 58-1). Sgt. Antal also testified credibly at the motions hearing about the search and the interview of Howeth. *See* ECF 97 at 115-140.

The search of the Residence was conducted by approximately five armed, uniformed members of the MSP. ECF 97 at 117-18, 144. At the outset of the search, the family members were gathered and directed to the kitchen. *Id.* at 118-19, 122. Antal then escorted defendant upstairs to his bedroom to get dressed. *Id.* at 120-21. Three uniformed officers were already in

the defendant's bedroom, but they did not interact with the defendant. *Id.* at 121. Antal told defendant he would then be brought outside so that he and the defendant could talk. *Id.* at 122. Howeth was not handcuffed. *Id.* at 124-25, 128.

Howeth asked to use the bathroom. As he did so, police officers waited outside, with the bathroom door ajar. *Id.* at 123-132. However, the police did not enter the bathroom itself while defendant was using it. Thereafter, Antal took Howeth to Antal's vehicle to interview him. *Id.* at 133. He was joined by Cpl. Tilghman. Antal sat in the driver's seat, Howeth sat in the front passenger seat, and Cpl. Tilghman sat in the back seat. *Id.* at 134. The interview was recorded by Antal's body worn camera. However, Antal captured defendant's body, such as his hands, but not his face.

Before Antal asked any substantive questions, he asked the defendant: "You too hot, too cold, you good?" Tr. at 1.[11] Defendant responded, "No sir, I'm good." *Id.* Sgt. Antal then advised defendant of his *Miranda* rights, reading each one out loud, from a form. He also provided a copy of the form to the defendant. The form sets out each of defendant's constitutional rights. Defendant signed the form under a line that states: "I have read or have had read to me this explanation of my rights." *See* ECF 47-2 at 97; ECF 50-2 ("Advice of Miranda Rights"). Howeth dated it "3/14/24." Antal also advised the defendant that he was "signing that I read that to you." Tr. at 1.

Then, Antal informed defendant of the content of the "next paragraph" on the form, which concerns the waiver of rights. *Id.* Antal read it, as follows, *id.* at 1-2: "I fully understand each of

---

[11] For the Court's convenience, the government provided a transcript of the interview, which is not docketed. Of course, it will be for the jury to determine what transpired.

these rights and I'm willing to answer questions without [consulting][12] my lawyer or have a lawyer present at the time.  My decision to answer questions is entirely free and voluntary and I have not been promised anything, nor have I been threatened or intimidated in any matter." *See also* ECF 50-2.  As if responding to the matter of threats and intimidation, Howeth answered, "No, sir."  Tr. at 2.

On the form itself, the words "Waiver of Miranda Rights" appear in boldface.  Howeth signed on the line provided for the waiver.  *See* ECF 50-2.  Curiously, Howeth wrote the date of 3/4/22 next to his signature, rather than the date of 3/14/24, which he used earlier.[13]  Sgt. Antal did not revisit the rights or the waiver so as to confirm with Howeth that he understood each right or the waiver.  Nor did he confirm that defendant wanted to speak with Antal without a lawyer. ECF 97 at 136.

It was Antal who posed most of the questions to Howeth.  But, Cpl. Tilghman also asked questions.  *See*, *e.g.*, Tr. at 16-24.  Howeth's answers to the officers' questions suggest that he was alert and oriented.  There is no indication that he was under the influence of drugs, medication, or alcohol.  He never requested a lawyer.  Nor did he ask to terminate the interview.  Moreover, neither Antal nor Tilghman ever made any threats or promises to defendant.  And, their tone of voice was consistently professional.

During the interview, defendant acknowledged that he had made some "poor choices."  Tr. at 2.  But, he claimed that it had been "months" since he had "searched" for "child porn."  *Id.* Howeth also identified Curl as his girlfriend.  Tr. at 3. He stated that he "had shared it [*i.e.* child porn] to her once before" and she told him not to do so.  *Id.*  According to Howeth, that was "Pretty

---

[12] The transcript says "counseling," but the form says "consulting."

[13] To my recollection, the parties did not note or address this discrepancy.

much the end of it." *Id.* Defendant also acknowledged that his email address is jacron@gmail.com. *Id.* at 5.

At the motions hearing, Antal explained why he conducted the interview in a police car, rather than in the house. He stated that it is not his practice to interview a suspect in a room full of family or other police officers. ECF 97 at 137. Rather, he tries to bring a suspect to an area "where it's a little bit more intimate so that person feels a little bit more comfortable." *Id.* He also claimed that sitting in a car, "one-on-one, it kind of helps break the ice a little bit . . . ." *Id.* at 138. And, he "felt it was more proper to have [defendant] sit in [the police] vehicle than it was to sit in a house while they were searching it." *Id.* at 139-40.[14]

With regard to the bathroom door being open when defendant was using it, Antal noted that the Residence had not yet been searched. *Id.* at 137. And, he explained that the police need to make sure evidence is not destroyed. *Id.*

During the search of defendant's Residence on March 14, 2024, "on-scene forensic previews were done of the devices that had been located to determine which would be seized and later searched pursuant to a separate warrant." ECF 58 at 9. A warrant application for these devices followed on March 19, 2024. ECF 47-2 at 80-83. The application identified ten items as "Target Devices." *Id.* at 81. Antal also submitted a supporting Affidavit. *Id.* at 84-92. He averred that, through his training and experience, he knows that individuals involved with child pornography often store photographs and videos on electronic devices and they are retained via cloud services. *Id.* at 90. Judge William Jones, then assigned to the District Court of Maryland for Dorchester County, issued the warrant that day. *Id.* at 93-96.

---

[14] The Court reiterates that Antal also interviewed Curl in his police vehicle.

14

Howeth's two Samsung cell phones were forensically examined.  Multiple images were found on the Samsung Galaxy S9.  They comprise a series in which the Minor Victim is in bed next to an adult male with an erect penis.  However, the face of the male is not visible.

The metadata associated with the files indicates that they were created on or about April 21, 2021, when the Minor Victim was five years old.  *Id.*  A text conversation between Curl and Howeth from around that same period was also uncovered.  *Id.*  Howeth texted, among other things, *id.*:  "She held me.  Of course I started leaking"; "She keeps wiping it.  And leaning in really close";  "Never really thought a little hand would have that effect."

Approximately 1100 images of commercially available CSAM were found on Howeth's other cell phone, the Samsung S21.  ECF 58 at 10.  The image that related to the Cybertip was also located.  *Id.*

On October 7, 2024, FBI Special Agent Grace Meyer applied for a search warrant to photograph the body of the defendant.  ECF 58-3.  At that time, only State charges were pending against the defendant.  She recounted, *inter alia*, that an examination of defendant's Samsung Galaxy S9 smartphone contained "a series of 49 images depicting a prepubescent female next to an adult male with an erect penis lying on a bed." *Id.* at 6.  The child's face is visible, along with the adult male's left hand, left leg, and foot.  *Id.* at 6-7.  But, the face of the adult male is not visible. *Id.* at 7.  The Affidavit also states, in part, *id.* at 7-9:

> 9.   . . . . The images appear to have been taken by the adult male while holding a phone or camera in his right hand looking down the length of his body. In the background of each image is a desk with three computer monitors. These images were created on either April 21, 2021 or April 22, 2021.
>
> 10. The adult male left foot depicted in the images has a distinctive alignment and lengths of the toes relative to one another. The adult male left hand, particularly the thumb holding the top area of the penis is clearly visible, showing distinctive details of knuckle shape, size, lines of in [sic] the skin, and nail shape and color.

15

11. The adult male's penis appears erect in the photos; the shaft of the penis appears significantly darker in coloration than the tip of the penis which has a pinker color. The close-up images of the penis also show details as to the shape and contours.

\*    \*    \*

13. On July 10, 2024, MSP investigators showed Jacquline Howeth a sanitized version of one of the images described above which depicted the female child's face. Jacquline Howeth identified the female in the image as M.H. Jacquline Howeth identified her and James Howeth's bedroom in the image based on the desk with three computers depicted in the background.

\*    \*    \*

15. I am requesting this particular search in order to positively identify whether or not James Howeth produced and is depicted in the sexually explicit images with his seven year old daughter and will limit the search: (1) in scope of the images (Howeth holding his penis in his left hand without manipulation); (2) in manner (the photos will be taken by a male agent (not the affiant) who will not touch or move Howeth's body in any way); and (3) in place (the photos will be taken in a private area within the Dorchester County Detention Center, away from other inmates, guards and personnel).

\*    \*    \*

17.    . . . I will not direct or order that the penis be made erect for these photographs.

United States Magistrate Judge Erin Aslan approved the warrant. *Id.* at 1. Thereafter, on October 8, 2024, FBI Special Agents Jeffrey Yesensky and Grace Meyer executed a search warrant for Howeth's person at the Dorchester County Detention Center ("DCDC"). ECF 50-2 at 17-19 (Meyer, Yesensky Search Warrant Execution Memo).

Both FBI agents testified credibly at the motions hearing. ECF 97 at 150-160 (Meyer); *id.* at 161-164 (Yesensky). Meyer recalled that she and Special Agent Yesensky identified themselves to the defendant and showed him the search warrant and the attachments, exclusive of the affidavit. *Id.* at 155, 156; *see* ECF 50-2 at 18. Defendant was afforded an opportunity to read the search warrant and the attachments. *Id.* Howeth was not advised of his *Miranda* rights. ECF 97 at 158.

16

Nor was he questioned by the agents. *Id.* at 160. But, in response to learning of the warrant, defendant stated that he did not understand why the agents were "doing the search warrant" because "the pictures on his phone have the exact same thing . . . ." ECF 50-2 at 18. Defendant "was advised that [the] Agents could not comment or talk to him without his attorney . . . ." *Id.*; *see* ECF 97 at 157.

The search warrant was executed in a secured room: there were no cameras, the only window in the room was covered up, and only Howeth, DCDC Lieutenant Officer Aubrey, and Agent Yesensky were present for the photographs. *Id*; ECF 97 at 157.

Agent Meyer knew, at the time she served the warrant, that defendant had legal counsel in his State case. *Id.* But, at that time, the defendant had not yet been federally charged. *Id.* at 159.

Agent Yesensky recalled that he and Agent Meyer advised defendant that they had a search warrant to photograph defendant's body. He reiterated that no questions were asked of the defendant. The photographs took about fifteen minutes to complete. *Id.* at 162.

## II.    The Search Warrant for the Residence

### A.  Defendant's Contentions

Defendant asserts multiple grounds to support his motion to suppress evidence derived from the execution of the search warrant at the Residence on March 14, 2024. ECF 47. According to defendant, the search warrant does not establish probable cause to search the Residence. ECF 47 at 1, 13. Therefore, he asserts that the warrant was "constitutionally defective." *Id.* at 13.

In particular, defendant contends that Antal's Affidavit fails to establish "the required nexus" between defendant's Residence and the suspected criminal activity. *Id.* at 1, 13, 14. In addition, defendant contends that the warrant fails to satisfy the particularity requirement of the Fourth Amendment. *Id.* at 2, 14, 30. In this regard, he maintains that the warrant "authorized law

enforcement to conduct unfettered forensic searches of electronic devices found at the residence" and authorized "'exploratory rummaging'", in violation of the Fourth Amendment. *Id.* at 14 (citation omitted). Therefore, defendant complains that law enforcement searched the content of various electronic devices before obtaining a separate warrant to do so. *Id.* at 13.

Moreover, defendant maintains that Sergeant Antal omitted material facts from his Affidavit and asserts that the inclusion of the information would have defeated probable cause. Specifically, defendant argues that Antal failed to make clear that Curl was the source of the child pornography and that she does not reside with defendant. *Id.*

### B. The Fourth Amendment, Probable Cause, and Search Warrants

### 1.

The Fourth Amendment to the Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. AMEND. IV.

The Fourth Amendment protects against unreasonable searches and seizures. *See, e.g.*, *Utah v. Strieff*, 579 U.S. 232, 237 (2016); *United States v. Mendenhall*, 446 U.S. 544, 551 (1980). Therefore, under the Fourth Amendment, "all searches and seizures must be reasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011). Indeed, "the ultimate touchstone of the Fourth Amendment is reasonableness[.]" *Fernandez v. California*, 571 U.S. 292, 298 (2014) (internal quotation marks omitted). As the Fourth Circuit observed in *United States v. Lyles*, 910 F.3d 787, 795 (4th Cir. 2018): "Reasonableness has many dimensions. One must be proportionality between the gravity of the offense and the intrusiveness of the search." In other words, "[t]he magnitude

of the intrusion relative to the seriousness of any offense 'is of central relevance to determining reasonableness[.]'" *Id.* at 796 (quoting *Maryland v. King*, 569 U.S. 435, 446 (2013)).

As noted, the MSP conducted a search of defendant's Residence pursuant to a warrant issued by a Maryland judge. A judicially authorized warrant is the cornerstone of the Fourth Amendment.

It is well settled that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. . . ." *United States v. United States District Court (Keith)*, 407 U.S. 297, 313 (1972); *see Lyles*, 910 F.3d at 793. "'At the very core'" of the Fourth Amendment "'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Indeed, "when it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013); *see United States v. Perez*, 167 F.4th 709, 715 (4th Cir. 2026). For this reason, "the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590 (1980).

The "purpose [of a search warrant] is to gather evidence necessary to determine whether a crime has been committed, and if so by whom." *United States v. Orozco*, 41 F.4th 403, 408 (4th Cir. 2022). And, "[w]hen it comes to the home, the reasonableness of a search is typically demonstrated when law enforcement conducts the search pursuant to a particularized warrant supported by probable cause." *Perez*, 167 F.4th at 715; *see Lange v. California*, 594 U.S. 295, 301 (2021); *see also Lyles*, 910 F.3d at 793-94 ("Castles, of course, are not impregnable, but neither are they lightly breached, thus giving rise to the Fourth Amendment requirement of a warrant supported by probable cause.").

To pass constitutional muster, a search warrant must satisfy the nexus requirement of the Fourth Amendment.  This means that the warrant must be supported by probable cause to believe that contraband, evidence of a crime, fruits or instrumentalities of a crime, or a person subject to arrest, will be found at the location to be searched.  F. R. Crim. P. 41(c); *see Florida v. Harris*, 568 U.S. 237, 243 (2013); *United States v. Grubbs*, 547 U.S. 90, 96 (2006); *United States v. McNeal*, 818 F.3d 141, 150 (4th Cir. 2016); *United States v. DeQuasie,* 373 F.3d 509, 520 (4th Cir. 2004).

Moreover, a constitutionally valid search warrant must describe with particularity the place to be searched and the items to be seized. *United States v. Davis*, 690 F.3d 226, 241 (4th Cir. 2013). "[A] search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional."  *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quotation and citation omitted).  I discuss particularity in more detail in the context of the discussion of the issue.

As mentioned, defendant maintains that the search warrant was defective because, *inter alia*, it did not establish nexus, *i.e.*, probable cause that evidence of a crime would be found at the Residence.  Probable cause is a flexible standard and a "fluid concept," *Maryland v. Pringle*, 540 U.S. 366, 370 (2003), which is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *see United States v. Ventresca*, 380 U.S. 102, 108 (1965); *United States v. Drummond*, 925 F.3d 681, 687 (4th Cir. 2019); *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011).  It is a "'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  *Pringle*, 540 U.S. at 370 (citations omitted; some internal quotation marks omitted); *see Gates*, 462 U.S. at 231; *Brinegar v. United States*, 338 U.S. 160, 176 (1949); *see also*

20

*United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992) (stating that probable cause "is not defined by bright lines and rigid boundaries.").

Indeed, the concept of probable cause "defies a precise definition[.]" *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010). But, probable cause is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014); *see District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018); *United States v. Henderson*, 136 F.4th 527, 532 (4th Cir. 2025).

Probable cause "exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found" in a particular place. *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *see Gates,* 462 U.S. at 238; *United States v. Sueiro*, 59 F.4th 132, 139 (4th Cir. 2023); *United States v. Montieth,* 662 F.3d 660, 664 (4th Cir. 2011). Notably, it "has long been understood to encompass circumstances that, while less than a preponderance, 'warrant suspicion.'" *United States v. Gondres-Medrano*, 3 F. 4th 708, 714 (4th Cir. 2021) (citation omitted).

In assessing probable cause, the court considers "'the suspect's conduct as known to the [judicial] officer, and the contours of the offense thought to be committed by that conduct.'" *L.M., a minor, by Jane Roe #1 v. Graham*, 168 F.4th 196, 201 (4th Cir. 2026) (quoting *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016)). "A probable cause determination mandates considering the 'totality-of-the-circumstances.'" *L.M.*, 168 F.4th at 201 (quoting *Gates*, 462 U.S. at 230).

In other words, to determine the existence of probable cause, the court does not consider each fact "'in isolation' . . . ." *Wesby*, 583 U.S. at 60 (citing *Pringle*, 540 U.S. at 372, n.2); *see Drummond*, 925 F.3d at 687. "The totality-of-the-circumstances test 'precludes this sort of divide-and-conquer analysis.'" *Wesby*, 583 U.S. at 61 (quoting *United States v. Arvizu*, 534 U.S. 266,

274 (2002)); *see Drummond*, 925 F.3d at 687.  Instead, "'the whole picture'" must be considered, because "the whole is often greater than the sum of its parts . . . ."  *Wesby*, 583 U.S. at 61 (citation omitted).  Therefore, a judge who is asked to issue a warrant must not engage in a "'technical dissection'" of the circumstances.  *Id.* at 60 (citation omitted).

Moreover, in evaluating a warrant application, a judge need not ignore common sense.  To the contrary, common sense must guide a judge who is asked to review a warrant request.  The issuing judge is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 238; *see, e.g.*, *Orozco*, 41 F.4th at 407 (recognizing "deferential, commonsensical standard of review"); *see also United States v Wellman*, 663 F.3d 224, 228 (4th Cir. 2011); *United States v. Grossman,* 400 F.3d 212, 217 (4th Cir. 2005).

In the face of a challenge to a warrant, the reviewing court must determine if the issuing judge had a "substantial basis" for concluding that the evidence sought would be discovered in the place described in the application.  *Gates*, 462 U.S. at 236; *see United States v. Hodge,* 354 F.3d 305, 309 (4th Cir. 2009); *United States v. Bynum*, 293 F.3d 192, 202 (4th Cir. 2002).  In *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984) (per curiam), the Supreme Court said: "The task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the Magistrate's decision to issue the warrant."

To effectuate the preference for warrants, "great deference" is accorded to the issuing judge's determination.  *Gates*, 462 U.S. at 236; *see Orozco*, 41 F.4th at 408; *Smith v. Munday*, 848

F.3d 248, 255 (4th Cir. 2017). Notably, an "overly stringent" construction of probable cause is not required. *United States v. Dargan*, 738 F.3d 643, 648 (4th Cir. 2013). The Supreme Court has "specifically cautioned against 'hypertechnical' scrutiny of affidavits lest police officers be encouraged to forgo the warrant application process altogether." *United States v. Robinson,* 275 F.3d 371, 380 (4th Cir. 2001) (quoting *Gates,* 462 U.S. at 236).

> In *Ventresca*, 380 U.S. at 108, the Supreme Court said:

> If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

*Accord Ornelas*, 517 U.S. at 696; *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011); *Montieth,* 662 F.3d at 664.

Moreover, the probable cause standard does not require law enforcement "to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information." *Taylor v. Farmer,* 13 F.3d 117, 121 (4th Cir. 1993).

On the other hand, there are "limits beyond which a magistrate may not venture in issuing a warrant," *Gates*, 462 U.S. at 239, and "[d]eference to the magistrate . . . is not boundless." *United States v. Leon*, 468 U.S. 897, 914 (1984); *see Smith*, 848 F.3d at 255. For example, wholly conclusory statements in a warrant application ordinarily will not suffice. *See Gates*, 462 U.S. at 239 (citing *Nathanson v. United States*, 290 U.S. 41 (1933) and *Aguilar v. Texas*, 378 U.S. 108 (1964)). Moreover, the issuing judge's action cannot be a "mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239. Nor can the government rely "upon post hoc

23

rationalizations to validate those seizures that happen to turn up contraband." *United States v. Foster*, 634 F.3d 243, 249 (4th Cir. 2011).  And, "'[p]olice officers generally have a duty to know the basic elements of the laws they enforce.'" *United States v. Doyle*, 650 F.3d 460, 473 (4th Cir. 2011) (citation omitted).

**2.**

As stated, defendant contends that the warrant application failed to satisfy the nexus requirement of the Fourth Amendment.  Under the Constitution, a warrant affidavit must establish a sufficient nexus between the place to be searched and the suspected criminal activity.  *Orozco*, 41 F.4th at 409; *Allen*, 631 F.3d at 173.  This requires a "fair probability" that evidence of the crime will be found at the place to be searched.  *Gates*, 462 U.S. at 238.  A warrant must also establish a "fair probabilty" for the belief that the suspect occupies or is otherwise connected to the targeted premises.  *Sueiro*, 59 F.4th at 139; *Henderson*, 136 F.4th at 532; *United States v. Cobb*, 970 F.3d 319, 326 (4th Cir. 2020); *see Gates*, 462 U.S. at 238; *Dargan*, 738 F.3d at 647; *United States v. Davis*, 690 F.3d 226, 241 (4th Cir. 2012); *Montieth*, 662 F.3d at 664.  But, again, this is a "'practical, commonsense determination' to be made by the issuing judge." *Orozco*, 41 F.4th at 409 (citation omitted).

Of import, the Fourth Circuit has "long held that an affidavit need not directly link the evidence sought with the place to be searched." *United States v. Jones*, 942 F.3d 534, 639 (2019); *see United States v. Ortiz*, 422 U.S. 891, 897 (1975); *United States v. Williams*, 548 F.3d 311, 320-21 (4th Cir. 2008); *United States v. Servance*, 394 F.3d 222, 230 (4th Cir. 2005), *vacated on other grounds*, 544 U.S. 1047 (2005); *United States v. Moore*, 477 Fed. App'x. 102, 105 (4th Cir. 2012); *Williams*, 974 F.2d at 480; *Grossman*, 400 F.3d at 217.  Relevant here, "'the nexus between the place to be searched and the items to be seized may be established by the nature of the item and

24

the normal inferences of where one would likely keep such evidence.'" *Doyle*, 650 F.3d at 471 (citation omitted); *see Orozco*, 41 F.4th at 409 (same); *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988), *cert. denied*, 488 U.S. 1031 (1989); *see also United States v. Trice*, 621 Fed. App'x 151, 153 (4th Cir. 2015) (per curiam); *Moore*, 477 Fed. App'x. at 105; *Richardson*, 607 F.3d at 371; *Williams*, 548 F.3d at 320.

It is also noteworthy that law enforcement officers "may draw conclusions from their experience, judgment, and observations when identifying the place to be searched." *United States v. Wienke*, 733 Fed. App'x 65, 69-70 (4th Cir. 2018); *see Ortiz,* 422 U.S. at 897 (stating that "officers are entitled to draw reasonable inferences from the[] facts in light of their knowledge of the area and their prior experience. . . ."); *United States v. Brignoni-Ponce,* 422 U.S. 873, 885 (1975) (concluding that "the officer is entitled to assess the facts in light of his experience. . . ."); *see also Orozco*, 41 F.4th at 412 n.9 (recognizing that "for crimes like drug trafficking that involve coordination," it may "be reasonable to believe that [the suspect's] cellphone will" contain evidence of his crimes); *Henderson*, 136 F.4th at 533; *Moore*, 477 Fed. Appx at 102.

With regard to defendant's claim that the warrant application fails to establish the requisite nexus between defendant's home and suspected criminal activity (ECF 47 at 14-22), defendant asserts, *inter alia*, that probable cause to arrest is not the same as probable cause to search. *Id.* at 21 (citing *United States v. Wilson*, 2025 WL 2490719, at *4 (5th Cir. Aug. 29, 2025)). Howeth argues that Antal's Affidavit "simply failed to provide the necessary bridge between the suspected criminal activity and Mr. Howeth's residence." ECF 47 at 21. He insists that the Affidavit "offered nothing to link the [defendant's] residence with evidence of suspected child pornography-related activity." *Id.* at 22. In his view, investigators only had reason to believe that evidence of suspected criminal activity would be found at Curl's residence. *Id.*

25

A search warrant is not necessarily invalid for failure to set forth facts establishing a direct link to the items sought at a particular location. *Anderson*, 851 F.2d at 729; *see Doyle*, 650 F.3d at 471; *Richardson*, 607 F.3d at 371. Of relevance here, the issuing judge has the "authority . . . to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant[.]" *Gates*, 462 U.S. at 240; *see also Ortiz,* 422 U.S. at 897 (stating that "officers are entitled to draw reasonable inferences from the[] facts in light of their knowledge of the area and their prior experience. . . .").

In child pornography cases, courts have expressed "the widespread view . . . that 'collectors and distributors of child pornography value their sexually explicit materials highly, 'rarely if ever' dispose of such material, and store it 'for long periods' in a secure place, typically in their homes.'" *Richardson*, 607 F.3d at 370 (quoting *United States v. Lacy*, 199 F.3d 742, 746 (9th Cir. 1997)); *cf. United States v. Ramsburg*, 114 Fed. App'x 78 (4th Cir. 2004) (per curiam) (rejecting staleness claim because "the instrumentalities of the alleged illegality tend to be retained"). So, for example, the Fourth Circuit has said that it is reasonable to infer that a computer used to distribute child pornography would be found at the defendant's home. *Richardson*, 607 F.3d at 371. Moreover, "consumers of child pornography frequently employ complex measures to keep their online activities secret." *United States v. Bosyk*, 933 F.3d 319, 327 (4th Cir. 2019).

I reject defendant's contention that Antal's Affidavit is constitutionally defective because it does not establish a direct link between defendant's Residence and child pornography activity. The Affidavit recounts that the MSP received a Cybertip that reported that Curl's phone number and the jacron email address were used to upload CSAM to Curl's cellular account. Search warrants were then issued for Curl's Verizon account and for her phone. Investigators ultimately determined that Howeth and Curl were involved in a romantic relationship. Howeth had named

Curl as an emergency contact for his child, according to the records of the Dorchester County Public Schools. Moreover, they determined that the jacron email, used to upload CSAM, actually belongs to Howeth. And, the MSP identified defendant's Residence.

In the search warrant Affidavit, Antal never expressly claimed that an individual who collects CSAM is likely to store it at his home. But, he averred that such material is often concealed on electronic devices to evade detection. The kinds of devices Antal mentioned are ones that, by common knowledge, are generally found on an individual's person and/or in a residence. And, a judicial officer could reasonably infer that such devices are often stored at a residence.

In *Riley v. California*, 573 U.S. 373 (2014), the Supreme Court said, *id.* at 401: "Cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises . . . ." The Court recognized that their use in our society is pervasive and they and other electronic devices can store significant information. *Id.* Of course, "the ubiquity of cell phones, standing alone, can[not] justify a sweeping search for such a device." *Sueiro*, 59 F.4th at 141; *see Henderson*, 136 F.4th 532-33. But, that is not what occurred here.

*United States v. Glass*, 160 F.4th 563 (4th Cir. 2025), also provides guidance. In that child pornography case, the defendant challenged a search warrant for his home, issued by a North Carolina judge. The affidavit recounted that the defendant's estranged wife saw CSAM on the defendant's cell phone. *Id.* at 569. In addition, the affidavit stated that there were two laptops in the house. *Id.* Although *Glass* largely concerns *Franks*, the Fourth Circuit was satisfied that there was probable cause to search both the cell phone of the defendant and his residence. *Id.* In reaching that conclusion, the Court observed that the laptops "could reasonably have been thought to contain evidence of [defendant's] receipt and possession of CSAM." *Id.*

27

Here, Antal avers in the Affidavit that CSAM is stored on electronic devices.  And, again, they are generally found in the home or on the person.  He also related that defendant's email was used to upload CSAM.

To be sure, "residential searches have been upheld only where some information links the criminal activity to the defendant's residence."  *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993).  Many courts have said that it is reasonable to infer that evidence pertaining to weapons or involvement in the drug trade is likely to be found where the suspect resides.

*Anderson*, 851 F.2d 727, illustrates that proposition.  There, the Court determined that probable cause existed to search a trailer for weapons, although the affidavit did not include facts indicating that weapons were located in the trailer.  *Id.* at 729.  The Court agreed with the reasoning articulated in cases from other circuits that established that the required nexus between the place to be searched and the items to be seized may be shown by consideration of the inferences of where one would likely keep such items.  *Id.*; *see United States v. Steeves*, 525 F.2d 33 (8th Cir. 1975) (concluding that people who own weapons generally keep them at home); *United States v. Rahn*, 511 F.2d 290 (10th Cir.) (finding it reasonable to assume that individuals store their weapons at home), *cert. denied,* 423 U.S. 825 (1975); *see, e.g., United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999); *United States v. McClellan*, 165 F.3d 535, 546 (7th Cir. 1999); *United States v. Henson*, 123 F.3d 1226, 1239 (9th Cir. 1997); *see also United States v. Jacobs*, 715 F.2d 1343 (9th Cir. 1983) (holding it reasonable for magistrate to conclude that articles of clothing could be found at suspect's residence); *Williams*, 548 F.3d at 319 (recognizing that the Court has "consistently determined that there was probable cause to support search warrants" for suspects' residences "on the basis of 1) evidence of the suspects' involvement in drug trafficking combined with 2) the

28

reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes.").

In *Grossman,* 400 F.3d 212, the Fourth Circuit determined that "it is reasonable to suspect that a drug dealer stores drugs in a home" for which he possesses a key. *Id.* at 218. There, the defendant challenged the nexus between his alleged drug offenses and three homes to which he had access, but in which he did not reside. *Id.* at 214. Law enforcement officers were informed by a confidential informant about the defendant's drug trafficking activities. *Id.* While the detectives were conducting surveillance, they observed the defendant exit his vehicle and use a set of keys to open the front door. *Id.* at 215. The defendant then exited the house and walked toward a different car. *Id.* Before the defendant entered the other car, he was stopped and questioned by the detectives. *Id.* The defendant made "several plainly false statements" to the police. *Id.*

Thereafter, the detectives obtained a search warrant for the residence that they had seen the defendant enter and exit. *Id.* They seized a large sum of cash, a loaded handgun, and documents addressed to the defendant at a different address. *See id.* One of the detectives went to the address listed on the documents. *Id.* The detective knocked on the door but no one responded. *See id.* He then determined that one of the defendant's keys opened the door to the residence. The detective obtained a warrant to search the second residence. *See id.* That search revealed a large sum of cash and approximately 4.5 kilograms of cocaine. *Id.* at 216. The detectives obtained and executed a warrant for a third address after learning that the defendant sometimes stayed with his aunt at the third address. *Id.*

The defendant moved to suppress the evidence seized in all three searches. *Id.* The Fourth Circuit affirmed the district court's denial of the defendant's motion to suppress, concluding that the evidence was sufficient to justify the issuance of the search warrants, and reiterating that "a

sufficient nexus can exist between a defendant's criminal conduct and his residence even when the affidavit supporting the warrant 'contains no factual assertions directly linking the items sought to the defendant's residence.'" *Id.* at 217 (citing *Servance,* 394 F.3d at 230).  Significantly, the Court said that "it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key." *Id.* at 218.  The Court added that the searches were not invalid merely because the defendant "splits his time among several different homes." *Id.*; *see also United States v. Sanders,* 272 Fed. Appx. 271, 273 (4th Cir. 2008) (per curiam).

Of course, this is not a drug case or a gun case.  But, the logic of the cases mentioned above applies here.  Antal averred that CSAM is often stored on electronic devices.  And, the State judge was entitled to infer from the Affidavit that such devices would be found at the Residence because an individual usually has his cell phone with him.  The judge could also infer that other electronic devices, such as a desktop computer, a laptop computer, or an iPad, are usually stored at home.

Considering the probable cause standard, reviewed at length earlier, I conclude that the Affidavit adequately establishes the requisite nexus to Howeth's Residence.

**3.**

As noted, defendant complains that the warrant failed to satisfy the Fourth Amendment's particularity requirement.  He reasons that law enforcement had "unfettered discretion to conduct forensic examinations of electronic devices."  ECF 47 at 33.

The government disputes that the search warrant authorized "general, exploratory rummaging in the [sic] Howeth's belongings."  ECF 58 at 19.  It points out that the search warrant expressly permitted investigators to "preview" the electronic devices.  And, given that there were multiple household members at the Residence, and the possibility that some devices did not belong to Howeth, the government seems to suggest that this approach avoided inconvenience to persons

not believed to have engaged in wrongdoing by limiting the unnecessary seizure of their devices. ECF 97 at 78.

"At its core, the Fourth Amendment protects against general warrants that authorize 'exploratory rummaging in a person's belongings . . . by requiring a particular description of the things to be seized.'" *United States v. Williams,* 592 F.3d 511, 519 (4th Cir. 2010) (quoting *Andresen v. Maryland,* 427 U.S. 463, 480 (1976)) (alterations in *Williams*; internal quotation marks omitted); *accord Dargan*, 738 F.3d at 647. The purpose of the particularity requirement is to ensure "that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison,* 480 U.S. 79, 84 (1987).

The Fourth Circuit explained in *Cobb*, 970 F.3d at 326, that the Fourth Amendment "'specifies only two matters that must be 'particularly described' in the warrant: 'the place to be searched and 'the persons or things to be seized.'" (Quoting *Grubbs*, 547 U.S. at 97); *see United States v. Blakeney*, 979 F.3d 851, 862 (4th Cir. 2020). Notably, "[p]robable cause to believe that a person is engaged in criminal activity is not *carte blanche* to search all their personal effects." *Orozco*, 41 F.4th at 409. Accordingly, "when executing a warrant, officers are limited by its terms." *Dargan,* 738 F.3d at 647; *see United States v. Uzenski*, 434 F.3d 690, 706 (4th Cir. 2006) (The law forbids "'a general, exploratory rummaging in a person's belongings . . . .") (citations and internal quotations omitted); *Robinson*, 275 F.3d at 381.

Here, Judge Jones approved the search warrant application on March 13, 2024. ECF 47-2 at 79. Of import, he expressly authorized the MSP "to seize, *preview*, and analyze" any property specified in the warrant. *Id.* at 78 (emphasis added). In lieu of seizing all electronic devices, however, as the MSP had the right to do, the MSP instead previewed the devices, as the warrant

31

also permitted them to do.  In this way, the MSP avoided the unnecessary seizure of electronic devices.  There is no evidence that the MSP engaged in anything more than a "preview" of the devices.

The MSP seized thirteen devices.  Thereafter, as to those devices, on March 19, 2024, Sgt. Antal applied for another search warrant, in order to search them.  *See* ECF 47-2 at 80-96.  He averred that during the execution of the search warrant on March 14, 2024, he previewed defendant's cellular device, which revealed a photo of defendant one to two years earlier, showering naked with his daughter on his lap.  *Id.* at 90.  He also explained that, through his training and experience, evidence pertaining to crimes such as possession of child pornography and child sexual abuse "can be shared" on cellular devices or computers and "retained via cloud services . . . ." *Id.*  Judge William Jones, sitting on the District Court for Dorchester County, issued the warrant on that date.  *Id.* at 96.

Even if the search warrant for the Residence were overbroad, or if previewing the devices was improper, the government contends that the doctrines of inevitable discovery and good faith apply.  ECF 58 at 20.  As to inevitable discovery, it reasons that the seized devices were going to be searched pursuant to "a separate warrant," and therefore any relevant information would have been uncovered.  *Id.*

Ordinarily, in the absence of good faith, discussed *infra*, the exclusionary rule requires the suppression of evidence that is "obtained by way of a Fourth Amendment violation."  *Davis v. United States*, 564 U.S. 229, 232 (2011).  Such evidence is regarded as the fruit of unlawful police conduct.  *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963) (concluding that evidence derived in violation of the Fourth Amendment is deemed "fruit of the poisonous tree" and is inadmissible); *see United States v. Kimble,* 855 F.3d 604, 610 (4th Cir. 2017); *United States v.*

32

*Stephens*, 764 F.3d 327, 335 (4th Cir. 2014); *Doyle*, 650 F.3d at 466; *see also United States v. Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007) ("Indisputably, suppression of evidence obtained during illegal police conduct provides the usual remedy for Fourth Amendment violations."). As to the previewing, even if improper, the government argues that the inevitable discovery doctrine precludes suppression because the CSAM would have been discovered during the later search conducted pursuant to a search warrant.

The doctrine of inevitable discovery permits the introduction of improperly seized evidence "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix. v. Williams*, 467 U.S. 431, 444 (1984); *see United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017); *United States v. Whitehorn*, 813 F.2d 646, 650 (4th Cir. 1987). "'Lawful means' include searches that fall into an exception to the warrant requirement, 'such as an inventory search[] that would have inevitably uncovered the evidence in question.'" *United States v. Seay*, 944 F.3d 220, 223 (4th Cir. 2019) (citation omitted) (brackets in *Seay*).

"Inevitable discovery demands that the prosecution prove by a preponderance of the evidence: first, that police legally *could* have uncovered the evidence; and second, that police *would* have done so." *United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019) (emphases in original), *cert. denied*, 589 U.S. 1223 (2020). "'A finding of inevitable discovery necessarily rests on facts that did not occur,' but 'by definition the occurrence of these facts must have been likely, indeed inevitable, absent the government's misconduct.'" *Alston*, 941 F.3d at 138 (quoting *United States v. Allen*, 159 F.3d 832, 840 (4th Cir. 1998)).

Notably, "the premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence. Only then, if it can be shown that the taint did

not extend to the second search, would the product of the second search be admissible." *Whitehorn*, 813 F.2d at 650 n.4. "[T]he fact making discovery inevitable must 'arise from circumstances other than those disclosed by the illegal search itself.'" *United States v. Thomas*, 955 F.2d 207, 211 (4th Cir. 1992) (quoting *United States v. Boatwright*, 822 F.2d 862, 865 (9th Cir. 1987)). "The inevitable discovery exception 'involves no speculative elements but focuses on demonstrated historical facts.'" *Alston*, 941 F.3d at 139 (quoting *Nix*, 467 U.S. at 444 n.5).

Even assuming, *arguendo*, that the previewing of the electronic devices by the MSP was improper, I am satisfied that the inevitable discovery doctrine applies. Although the Court does not have much information about the way that the previewing took place during the execution of the search warrant on March 14, 2024, it appears that it was sufficient to enable the MSP to determine which devices to seize. Then, the MSP properly sought and obtained a search warrant to conduct a forensic search of the seized devices. If no preview had been conducted on site at the Residence, the MSP would have seized all of the electronic devices, because it was authorized to do so in accordance with the warrant. The subsequent search warrant that was obtained inevitably would have revealed the CSAM.

## C. Franks Hearing

### 1.

Ordinarily, an accused is not entitled to an evidentiary hearing to challenge the veracity of a facially valid search warrant. *Glass*, 160 F.4th at 568; *United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021); *United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019), *cert. denied*, 589 U.S. 1154 (2020); *Allen*, 631 F.3d at 171. When reviewing the issuing judge's probable cause finding, consideration is generally confined to the four corners of the warrant application. *See*, *e.g.*, *Gates*,

462 U.S. at 238.  There is, however, a narrow exception to this rule, which the Supreme Court fashioned in the seminal case of *Franks v. Delaware*, 438 U.S. 154 (1978).

*Franks* established that, under limited circumstances, an accused is entitled to an evidentiary hearing concerning the veracity of statements in a warrant application.  The Court articulated a two-pronged test as to what a criminal defendant must show when challenging the veracity of statements made in an affidavit supporting a search warrant.

Under the first prong—the "intentionality" prong—the defendant must show that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit."  *Franks*, 438 U.S. at 155-56.  An officer acts with reckless disregard when he fails to "inform the magistrate of facts she subjectively knew would negate probable cause."  *United States v. Haas*, 986 F.3d 467, 475 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 292 (2021).

Under the second prong—the "materiality" prong—the defendant must show that, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause."  *Franks*, 438 U.S. at 156; *see United States v. Seigler*, 990 F.3d 331, 334 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 336 (2021).  In other words, the defendant must show that, without those false statements, the affidavit cannot support the finding of probable cause. *United States v. McKenzie-Gude,* 671 F.3d 452, 462 (4th Cir. 2011); *United States v. Clenney,* 631 F.3d 658, 663 (4th Cir. 2011); *Richardson*, 607 F.3d at 369.  On the other hand, if the allegedly false statements are not necessary for the probable cause finding, the accused is not entitled to a *Franks* hearing.  *Franks,* 438 U.S. at 155-56; *see Doyle*, 650 F.3d at 468 (stating that "false information will only void a warrant if the information was necessary to the finding of probable cause."); *Allen*, 631 F.3d at 171; *United States v. Gary*, 528 F.3d 324, 328 (4th Cir. 2008).

The two-pronged *Franks* test applies to cases "in which an agent includes affirmatively false statements in a warrant affidavit, [and] also when an agent *omits* relevant facts from the affidavit." *United States v. Lull*, 824 F.3d 109, 114 (4th Cir. 2016) (emphasis in *Lull*); *United States v. Cioni*, 649 F.3d 276, 286 (4th Cir. 2011); *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). But, "omission-based attacks to affidavits trigger 'an even higher evidentiary burden' than challenges based on false disclosures." *Glass*, 160 F.4th at 569 (citation omitted); *see Lull*, 824 F.3d at 115 ("Understandably, the defendant's burden in showing intent is greater in the case of an omission because '[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.'") (citing *Colkley*, 899 F.2d at 300) (alternation in *Colkley*). Thus, "[m]erely identifying factual omissions is insufficient." *Clenney*, 631 F.3d at 664. Therefore, the fact of omission "cannot alone show recklessness or intentionality." *Haas*, 986 F.3d at 475.

*Franks* is inapplicable when inclusion of the omitted facts would not have changed the "probable cause calculus. . . ." *Cioni,* 649 F.3d at 286. If the omitted facts are inserted into the warrant affidavit and, as "'revised,'" there is still probable cause, then the defendant is not entitled to a *Franks* hearing. *Jones*, 942 F.3d at 640. Put another way, if the affidavit establishes probable cause, despite an alleged omission, the omission is of no moment. *Id.*; *see Lull*, 824 F.3d at 117. So, "[f]or an omission to serve as the basis for a hearing under *Franks,* it must be such that its inclusion in the affidavit would defeat probable cause . . . ." *Colkley,* 899 F.2d at 301.

The defendant has the burden to establish both prongs of the test by a preponderance of the evidence. *Franks*, 438 U.S. at 156. Given the "presumption of validity with respect to the affidavit supporting the search warrant," *id*. at 171, the Fourth Circuit has characterized the burden as a "heavy" one. *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008). If both prongs are met, the

search warrant must be voided and the fruits of the search excluded. *Franks*, 438 U.S. at 155-56; *see Pulley*, 987 F.3d at 376.

"To establish entitlement to a *Franks* hearing based on information omitted from the warrant affidavit, [the defendant] [is] required to make a 'substantial preliminary showing' that the omissions were intentional or reckless, and that the omitted information was material to the magistrate's probable cause determination." *United States v. Jones*, 942 F.3d 634, 640 (4th Cir. 2019) (citation omitted); *see United States v. Wharton*, 840 F.3d 163, 168 (4th Cir. 2016).

So, "to obtain a *Franks* hearing, the defendant must show that the omissions were '*designed to mislead,* or . . . made in *reckless disregard of whether they would mislead*' and that the omissions were material, meaning that their 'inclusion in the affidavit would defeat probable cause.'" *Clenney*, 631 F.3d at 664 (quoting *Colkley*, 899 F.2d at 301) (emphasis in *Clenney*). A showing that an officer was merely negligent, or that the omission was simply an innocent mistake, is insufficient to warrant suppression. *Franks*, 438 U.S. at 171; *Miller v. Prince George's Cty.*, 475 F.3d 621, 627-28 (4th Cir. 2007); *see also United States v. Shorter*, 328 F.3d 167, 170 (4th Cir. 2003) ("[M]ere[] negligen[ce] in recording the facts relevant to a probable-cause determination" is not enough). Moreover, "the significance – or insignificance – of a particular omission to the determination of probable cause may inform [the court's] conclusion regarding the agent's intent.[]" *Lull*, 824 F.3d at 117.

Critically, a showing of falsity "cannot be conclusory and must rest on affidavits or other evidence." *Moody*, 931 F.3d at 370; *see United States v. Landaverde-Giron*, 2022 WL 101941, at *1 (4th Cir. Jan. 11, 2022) (per curiam); *Haas*, 986 F.3d at 474-75. Thus, "the defendant cannot rely on a purely subjective disagreement with how the affidavit characterizes the facts." *Moody*, 931 F.3d at 370. A showing of reckless disregard "is just as demanding." *Id.* at 371. "[R]eckless

37

disregard in the *Franks* context requires a showing that the affiant personally recognized the risk of making the affidavit misleading." *Pulley*, 987 F.3d at 377. Again, "mere conclusory allegations" are not sufficient. *Moody*, 931 F.3d at 371.

Because "warrant affidavits are 'normally drafted by nonlawyers in the midst and haste of a criminal investigation.' . . . [t]hey must be interpreted in a commonsense manner, neither held to the standard of what judges or lawyers feel they would have written if given the opportunity nor 'judged as an entry in an essay contest.'" *Moody*, 931 F.3d at 372 (internal citations omitted); *see also Seigler*, 990 F.3d at 344-45. However, if the affiant's perjury or reckless statements are established by a preponderance of the evidence, then "the warrant 'must be voided' and evidence or testimony gathered pursuant to it must be excluded." *Colkley*, 899 F.2d at 300 (quoting *Franks*, 438 U.S. at 156). Indeed, if a warrant violates *Franks*, it is not subject to the good faith exception to the exclusionary rule under *Leon*, 468 U.S. at 923 and its progeny. *See Doyle*, 650 F.3d at 467.

In sum, in order to obtain an evidentiary hearing regarding the integrity of an affidavit in support of a warrant, a defendant must first make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155-56. This showing "must be more than conclusory," and "must be accompanied by an offer of proof" in order to overcome the "presumption of [the warrant's] validity." *Franks*, 438 U.S. at 171; *see Clenney,* 631 F.3d at 663. And, as indicated, the false information, whether statements or omissions, must be essential or material to the probable cause determination. *Franks*, 438 U.S. at 171-72.

Two *Franks* cases decided by the Fourth Circuit are among many that illustrate the principles articulated above.

In *Colkley*, 899 F.2d 297, a bank robbery case, defendant Johnson complained that the district court should have suppressed his post-arrest incriminating statements, because the affidavit in support of the arrest warrant did not recount that eyewitnesses failed to identify Johnson in a photo spread. In addition, he complained that the agent based the composite height description of the vault robber, allegedly Johnson, on the testimony of only one witness, disregarding other witnesses who described the vault robber as shorter than the person depicted in the affidavit. On this basis, the defendant requested and received a *Franks* hearing.

The Fourth Circuit did not agree with the district court that a *Franks* hearing was appropriate. In its view, the defendant did not make the requisite preliminary showing that the affiant intended to mislead the magistrate, and inclusion of the omitted information would not have defeated probable cause in any event. *Id*. at 300.

As to a claim of omission, the Fourth Circuit was mindful of "the realities of the warrant application process." *Id*. It stated: "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Id*. Although a decision not to include information is intentional, a mere intentional omission is not within the scope of *Franks*, because the requisite intent would be satisfied in virtually every case. The *Colkley* Court stated: "*Franks* clearly requires defendants to allege more than 'intentional' omission in this weak sense." *Id.* at 301. The Court continued: "*Franks* protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate . . . . To obtain a *Franks* hearing, the defendant must show that the omission is the product of a 'deliberate falsehood or of reckless disregard for the truth.'" *Id.* (quoting *Franks*, 438 U.S. at 171).

Thus, the *Colkley* Court recognized that "the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to

include a matter that might be construed as exculpatory." *Colkley*, 899 F.2d at 301. In its view, the most that the record revealed was the agent's "failure to include the photospread information . . . ." *Id.* However, the Court declined to infer intent or recklessness from the mere fact of such an omission. *Id.* As to that conduct, the Fourth Circuit observed that the agent's "acts fell far short of the level of flagrant police action *Franks* is designed to prevent, and a hearing under that decision was not required." *Id.*

In the Fourth Circuit's view, to the extent that the photospread information was exculpatory, it was not enough to defeat probable cause when weighed against the content of the affidavit. *Id.* at 302. The Court recognized that "a requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process. The rule would place an extraordinary burden on law enforcement officers, who might have to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded." *Id.* at 303. The Court concluded: "In short, a rule requiring affiants to disclose all potentially exculpatory information has nothing to recommend it. Unless the defendant makes a strong preliminary showing that the affiant excluded critical information from the affidavit with the intent to mislead the magistrate, the Fourth Amendment provides no basis for a subsequent attack on the affidavit's integrity." *Id.*

In *Tate*, 524 F.3d 449, the Court reached a contrary result. There, the Baltimore Police Department ("BPD") obtained a warrant to search the defendant's home for drugs. *Id.* at 450-51. There, they found a firearm, and defendant was charged with unlawful possession of a firearm by a felon. *Id.* at 451.

The warrant was obtained on the basis of a BPD officer's investigation of defendant's trash. *Id*. In the affidavit for the search warrant, the BPD officer averred that he had searched trash bags that were "easily accessible" from the rear yard of defendant's house, and uncovered marijuana residue as well as related drug paraphernalia. *Id*. at 451.

The defendant argued that the warrant was deliberately written to mislead the judge to assume that the trash search had been conducted legally, in that it was abandoned for pickup. *Id*. at 452. In reality, according to the defendant, the BPD officer had trespassed into defendant's yard to search the trash, and therefore the search was unconstitutional under *California v. Greenwood*, 486 U.S. 35 (1988). *Tate*, 524 F.3d at 452. As a result, the defendant challenged the validity of the warrant, which included the contents of the search of the trash.

To support Tate's request for a *Franks* hearing, he proffered, *inter alia*, a letter from the Division Chief of the Baltimore Department of Public Works' Bureau of Solid Waste as to when the defendant's trash collection occurred; two affidavits, one from a neighbor and another from a defense investigator concerning the trash pickup and where Tate's garbage was stored; photographs of the residence showing a locked gate and the area where the trash was kept; and a copy of another search warrant affidavit two months earlier in an unrelated case, in which the same officer stated that the trash bags were easily accessible in language quite similar to what was in the affidavit at issue. The district judge denied the request for a *Franks* hearing.

The Fourth Circuit concluded that Tate had made the requisite preliminary showing that the law enforcement agent had knowingly and intentionally, or with reckless disregard for the truth, omitted a material statement in the Affidavit in support of the warrant. *Id*. at 457. Focusing on the agent's omission of facts about the location of trash that had been searched, the contents of which undergirded the affidavit, the Fourth Circuit reasoned, *id.* at 456: "If Tate's facts are correct,

41

the affidavit omitted the important details . . . that the trash had not been abandoned, and that the trash bags were seized in violation of Tate's reasonable expectation of privacy."

According to the Court, the facts, as proffered, tended to show that the agent "may have violated Tate's reasonable expectation of privacy because the trash was not out at the curb for collection on the date of Agent Manners' search but rather in a container near the rear steps of the home." *Id.* Responding to the government's argument that the wording of the affidavit was "literally true," the Court remarked: "A 'literally true' affidavit thus can be intentionally misleading if it deliberately omitted material facts which, when included, would defeat the probable cause showing and thus render false the original 'literally true' affidavit." *Id.* at 456-57.

Moreover, the Court determined "that if Tate's facts are true, the inclusion of the allegedly omitted information – that Agent Manners illegally searched Tate's trash – would have defeated probable cause. If the trash investigation was conducted illegally, the facts derived from it would have to be stricken from the affidavit." *Id.* at 457. And, said the *Tate* Court: "Without the facts drawn from the trash investigation, the remaining contents of the affidavit would not have supported a finding of probable cause." *Id.*

### 2.

Defendant complains that Antal omitted two material facts in the search warrant Affidavit for the Residence that, if included, would have "defeated" probable cause. ECF 47 at 22, 24. These concern Curl's residence, which was separate and apart from where defendant lived, and the fact that it was Curl who uploaded the pornographic image on her phone that was the subject of the Cybertip. *Id.* Therefore, he contends that he is entitled to a *Franks* hearing. *Id.* at 22-30.

As to Curl's residence, defendant asserts, *id.* at 23: "Despite knowing Ann Curl's residential address (and knowing that it was not the same as Mr. Howeth's residential address),

Sgt. Antal omitted it from the affidavit."  In defendant's view, the omission was either intentional or reckless, and it was material, because it misled the judge "into believing that Ann Curl resided with Mr. Howeth" at the Residence.  *Id.*  He adds that the omission was also material because it "would have eliminated any purported connection between Mr. Howeth's residence and the suspected criminal activity."  *Id.*  And, he asserts that Antal was "fully aware" of Curl's address.  *Id.* at 24.

According to defendant, Antal "framed the affidavit in a way to lead the magistrate judge into believing that Ann Curl resided with" defendant.  *Id.* at 28.  And, defendant contends that the requisite nexus can only be found if the judge believed Curl resided with the defendant.  *Id.* at 29.  Howeth posits, *id.* at 28:  "If the judge knew that Ann Curl resided at an address in a different county approximately 40 miles away, there would be no probable cause to search Mr. Howeth's residence."

As noted, defendant also maintains that Antal's Affidavit failed to disclose that "the child pornography image was uploaded to the Synchronoss cloud because Ann Curl viewed it on her phone."  *Id.* at 24.  In other words, Antal failed to disclose that Curl "was the source of the child pornography image that was uploaded to the Synchronoss cloud . . . ."  *Id.* at 26.  In his view, "[a]t a bare minimum," the omission of this information was in reckless disregard of whether it would render the affidavit "misleading."  *Id.*

As I see it, defendant has failed to show that the omissions were intentional or reckless, *i.e.*, "designed to mislead" or "made in reckless disregard of whether they would mislead." *Clenney*, 631 F.3d at 664 (citation, quotations, and emphasis omitted).  Moreover, he has failed to demonstrate materiality.

43

It is inaccurate, in my view, to suggest that Antal failed to identify Curl as the source of child pornography uploaded to the Synchronoss cloud storage account. Nor did Antal omit material information by failing to include that Curl and Howeth did not live together at the Residence.

Certainly, Antal never suggested in the Affidavit that Howeth and Curl actually lived together. "A competent reader could reasonably have inferred" that they did not reside together. *See Glass*, 160 F.4th at 570. And, as the government puts it, ECF 58 at 17, "The fact that Curl had a legal residence that was separate from Howeth's residence is hardly an omission, let alone a material one . . . ."

I agree with the government that "[i]t was immaterial whether Curl resided at Howeth's residence or had her own separate residence." ECF 58 at 17. Probable cause to search Howeth's Residence did not turn on whether Curl resided with him. Nor would probable cause have been defeated if Antal expressly stated that the two actually lived some 40 miles apart.

It is the connection between Curl and Howeth that mattered. And, the Affidavit clearly showed that connection. The Affidavit links the two by describing information establishing a romantic relationship between them. For example, Antal disclosed that Howeth listed Curl as an emergency contact with DCPS. It was defendant's jacron email that was used to upload CSAM that ended up on Curl's Syncronoss Cloud storage account.

Defendant's contention that the Affidavit should have identified Curl as the source of the upload is also not persuasive. Information is provided in the Affidavit as to Curl. But, it was defendant's jacron email that was used to upload the CSAM that ended up on Curl's Syncronoss Cloud storage account. Even if Curl was involved in the offense, this would not exculpate

44

defendant.  In other words, regardless of what Curl did or did not do, her conduct does not preclude the involvement of Howeth.  It is not one or the other.  It could be both.

Even assuming an omission, this is not enough to justify a *Franks* hearing.  As stated, defendant must show intentionality.  Defendant does not point to any facts probative of an intent by Antal to mislead or reckless disregard of whether the omission would mislead.  *See Jones*, 942 F.3d at 640; *Clenney*, 631 F.3d at 664.  Mere negligence, or sloppy draftsmanship, is inadequate under *Franks*, 438 U.S. at 171; *see Jackson v. Carin*, 128 F.4th 525, 534 (4th Cir. 2025); *Moody*, 931 F.3d at 370; *Shorter*, 328 F.3d at 170.  As the Fourth Circuit made clear in *Moody*, 931 F.3d at 371-72, an imprecisely worded Affidavit cannot, by itself, serve as the basis to infer an intentional mental state.

In sum, defendant's *Franks* motion is toothless.

### D. The Exclusionary Rule and the Good Faith Doctrine

Alternatively, even assuming a constitutionally deficient warrant, the government relies on the good faith doctrine.  The Court readily agrees that the good faith doctrine would apply.

When a search and seizure violates the Fourth Amendment, "evidence obtained in violation of the Fourth Amendment" may be inadmissible under the exclusionary rule, which is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect."  *United States v. Calandra*, 414 U.S. 338, 348 (1974); *see United States v. Lowers*, ___ F.4th ___, 2026 WL 667918 (4th Cir. Mar. 10, 2026); *United States v. Rau*, 141 F.4th 129, 134 (4th Cir. 2025); *Kimble*, 855 F.3d at 610; *Stephens*, 764 F.3d at 335.  The exclusionary rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."  *United States v. McLamb*, 880 F.3d 685, 690 (4th Cir. 2018).

However, the Supreme Court recognized a good faith exception to the exclusionary rule in *Leon*, 468 U.S. at 897, and the companion case of *Massachusetts v. Sheppard*, 468 U.S. 981 (1984). In *Leon*, the Court considered whether "suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" was justified. *Id*. at 922. In establishing the good faith exception to the exclusionary rule, *Leon* provided for the admissibility of evidence seized pursuant to a warrant subsequently determined to be invalid, if the "officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *Id.*

Accordingly, when investigators "act with an objectively 'reasonable good-faith belief' that their conduct is lawful," the exclusionary rule does not apply. *Davis*, 564 U.S. at 238 (quoting *Leon*, 468 U.S. at 909). The cost of exclusion is particularly high—and often disproportionate to exclusion's deterrent effect—"when law enforcement officers have acted in objective good faith or their transgressions have been minor." *Leon*, 468 U.S. at 908.

The exclusionary rule is a "'prudential' doctrine," fashioned "to 'compel respect for the constitutional guaranty.'" *Davis*, 564 U.S. at 236 (citations omitted). It "is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Id.* (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)); *see Herring v. United States*, 555 U.S. 135, 141 (2009); *Leon*, 468 U.S. at 906; *Lowers,* 2026 WL 667918 at *17. Rather, its purpose is to "deter future Fourth Amendment violations." *Davis*, 564 U.S. at 236-37; *see United States v. Edwards*, 666 F.3d 877, 886 (4th Cir. 2011).

Notably, "[e]xclusion exacts a heavy toll on both the judicial system and society at large," because "[i]t almost always requires courts to ignore reliable, trustworthy evidence." *Davis*, 564 U.S. at 237. And, the "'unbending application'" of the exclusionary rule "'would impede unacceptably the truth-finding functions of judge and jury'", and "'generat[e] disrespect for the

46

law and administration of justice.'" *Leon*, 468 U.S. at 907-08 (citations omitted). As a result, the mere fact of a Fourth Amendment violation does not always require exclusion.  *Herring*, 555 U.S. at 140; *Stephens*, 764 F.3d at 335.  Rather, the Supreme Court has limited the rule's operation to situations in which [its deterrent] purpose is 'thought most efficaciously served.'" *Davis*, 564 U.S. at 237 (quoting *Calandra*, 414 U.S. at 348); *see Lowers*, 2026 WL 667918, *17.  Put another way, "[e]xclusion of evidence only is appropriate if the deterrence benefits of suppression outweighs the heavy societal costs of exclusion." *United States v. Wilks*, 647 F.3d 520, 523 (4th Cir. 2011); *Herring*, 555 U.S. at 145; *United States v. Fall*, 955 F.3d 363, 371 (4th Cir. 2020); *United States v. Lyles*, 910 F.3d 787, 796 (4th Cir. 2018); *United States v. Thomas*, 908 F.3d 68, 73 (4th Cir. 2018); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018); *Doyle,* 650 F.3d at 467; *Perez*, 393 F.3d at 461.

Leon teaches that the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal" in light of "all of the circumstances." *Leon*. 468 U.S. at 922 n.23; *see also Thomas*, 908 F.3d at 70; *Stephens*, 764 F.3d at 335; *McKenzie-Gude*, 671 F.3d at 459.  In other words, suppression is not appropriate when "the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful." *United States v. Rush*, 808 F.3d 1007, 1010 (4th Cir. 2015).  But, "good faith does not mandate best practices." *United States v. Aigbekaen*, 943 F.3d 713, 725 (4th Cir. 2019).  Nor is the exclusionary rule a "strict-liability regime." *Davis*, 564 U.S. at 240.

Indeed, exclusion is a "'last resort'".  *Davis*, 564 U.S. at 237 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)); *see Lowers*, 2026 WL 667918, at *17.  Instead, the exclusionary rule

47

calls for a "balancing approach," which entails weighing the deterrent effect of suppression against the costs of exclusion, on a case-by-case basis. *Leon*, 468 U.S. at 913-24.[15]

Under *Leon*, 468 U.S. at 922, there are four circumstances when exclusion of evidence remains the appropriate sanction even if an officer "has obtained a warrant and abided by its terms." The four situations when the sanction of exclusion is an appropriate remedy are as follows: 1) if the magistrate or judge who issued the warrant was misled by information in an affidavit that the affiant knew was false or would have known but for his reckless disregard for the truth; 2) if the issuing magistrate wholly abandoned his judicial role; 3) the affidavit supporting the warrant is "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; 4) the warrant is "so facially deficient — i.e., in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid." *Leon,* 468 U.S. at 923 (citations omitted); *see Wellman*, 663 F.3d at 228-29; *DeQuasie,* 373 F.3d at 519-520.

The *Leon* Court said, 468 U.S. at 926: "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." In this case, none of the four circumstances outlined above has been established. The good faith doctrine is available to the government.

**2.**

---

[15] The "good faith" exception carries equal force when law enforcement agents act in reasonable reliance on judicial decisions authorizing their conduct. *Davis*, 564 U.S. 229. The same reasoning applies when law enforcement agents act in accordance with a state statute. *See Illinois v. Krull*, 480 U.S. 340, 356-60 (1987) (holding that exclusionary rule did not apply to evidence obtained by officers acting in reliance on a state statute authorizing warrantless administrative search, where statute was subsequently found to violate the Fourth Amendment and search was deemed unconstitutional).

Notwithstanding the importance of the exclusionary rule to Fourth Amendment jurisprudence, the *Leon* Court determined that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Leon,* 468 U.S. at 918. The Court reasoned, *id.* at 922: "We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion."

Pertinent here, in *Sheppard*, 468 U.S. at 989-90, the Supreme Court added: "[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him . . . that the warrant he possesses authorizes him to conduct the search he has requested." Ordinarily, a "'warrant issued by a magistrate . . . suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" *Leon,* 468 U.S. at 922 (citation omitted). *See*, *e.g.*, *Herring*, 555 U.S. at 145; *Henderson*, 136 F.4th at 531-32; *Fall*, 955 F.3d at 371; *Lyles*, 910 F.3d at 796; *Thomas*, 908 F.3d at 73; *Chavez*, 894 F.3d at 608; *Doyle,* 650 F.3d at 467; *Perez,* 393 F.3d at 461.

Of course, "the officer's reliance on the magistrate's probable-cause determination . . . must be objectively reasonable . . . and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Leon*, 468 U.S. at 922-23 (citations and footnotes omitted). But, suppression is not appropriate when "the police act with an objectively reasonable good-faith belief that their conduct is lawful." *Rush*, 808 F.3d at 1010.

Notably, "evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.'" *Henderson*, 136 F.4th 531-32 (quoting *Perez*, 393 F.3d at 461 (cleaned up)). Evidence acquired in "'a search conducted under the authority of a warrant' should not be suppressed 'unless a

49

reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *Henderson*, 136 F.4th at 531 (quoting *Bynum*, 293 F.3d at 195 (cleaned up)). Therefore, the question here is whether it was reasonable for Sgt. Antal to rely on the judicially issued search warrant for the Residence. *Henderson*, 136 F.4th at 532; *see United States v. Andrews*, 577 F.3d 231, 235 (4th Cir. 2009); *Williams*, 548 F.3d at 317.

*Henderson*, 136 F.4th at 532, is instructive. There, the Fourth Circuit reiterated that the court affords "'great deference'" to the "issuing jurist" and asks "only 'whether the judicial officer had a substantial basis for finding probable cause.'" (quoting *Blakeney*, 949 F.3d at 859 (cleaned up)). Of import, the Court explained that in this context it is not assessing whether there is probable cause to support the warrant. *Henderson*, 136 F.4th at 532. Rather, the question is whether the affidavit is "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* (quoting *Leon*, 461 U.S. at 923) (cleaned up). Moreover, the Court said: "This is an even 'less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause in the first place.'" *Id.* (quoting *Bynum*, 293 F.3d at 195).

Sergeant Antal attempted to comply with the law at every step. He sought court approval for the search from a member of the Maryland judiciary by applying for a search warrant that detailed his knowledge of pertinent information. It is certainly not a bare bones Affidavit; there are considerable factual details included in it.

If the information was legally deficient, either to establish nexus or the requisite particularity, then the Maryland judge should not have authorized the warrant. But, any alleged deficiency was hardly apparent. The officers executing the warrant issued by the State judge had "reasonable grounds" to believe it was lawful and valid. *Leon*, 468 U.S. at 923.

50

Indeed, it is only through flyspecking and the proverbial "Monday morning quarterbacking" that able defense counsel, in the quiet of reflection, has parsed the Affidavit and crafted sophisticated criticisms. At the end of the day, these challenges do not establish that the MSP unreasonably relied on the warrants. A court must "refrain from nitpicking warrant affidavits with clarity afforded only by hindsight and the absence of an urgent, ongoing criminal investigation." *Glass*, 150 F.4th at 568.

As the *Lowers* Court reiterated, 2026 WL 667918, at *17, "courts should refuse to apply the exclusionary rule where its application would yield no real 'appreciable deterrence.'" (quoting *Herring*, 555 U.S. at 141, in turn quoting *Leon*, 468 U.S. at 909). This is such a case. The goal of deterrence of police conduct that is deliberate, reckless, or grossly negligent, *McLamb*, 880 F.3d at 690, would not be "achieved through the suppression of evidence obtained by 'an officer acting with objective good faith'", pursuant to a search warrant issued by a judicial officer. *Perez*, 393 F.3d at 461 (citation omitted); *see Stephens*, 764 F.3d at 335.

I readily conclude that, even assuming a lack of probable cause, the warrant issued by a State judge is not so lacking in indicia of probable cause as to alert Sgt. Antal or the other MSP officers not to rely on it. The good faith doctrine would apply.

### III.    Defendant's Custodial Statements

Howeth seeks to suppress statements he made during an interview conducted in a police car while his home was being searched on March 14, 2024. He also seeks to suppress statements he made on October 8, 2024, when FBI Special Agents Jeffrey Yesensky and Grace Meyer executed a search warrant for his person while he was detained at DCDC.

### A.  Legal Standard

The Fifth Amendment to the Constitution provides, in part: "No person . . . shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege against self-incrimination, applicable when the defendant is subject to custodial interrogation. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) (reaffirming *Miranda* as "a constitutional rule").

Prior to questioning an individual in police custody, the suspect "'must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) (quoting *Miranda*, 384 U.S. at 444). Unless a defendant in custody is advised of these rights and knowingly and voluntarily waives them, any incriminating statements made by the suspect during custodial interrogation must be suppressed. *United States v. Ivey*, 60 F.4th 99, 112 (4th Cir. 2023); *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017); *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012).

"The four warnings *Miranda* requires are invariable. . . ." *Florida v. Powell*, 559 U.S. 50, 60 (2010). But, there is no "'precise formulation of the warnings'" that is needed to satisfy *Miranda's* "'strictures.'" *United State v. Dire*, 680 F.3d 446, 474 (4th Cir. 2012), *cert. denied*, 568 U.S. 1145 (2013) (citation omitted). And, the warnings may be oral or written. *Id.* Moreover, the Fourth Circuit "has rejected attempts to add additional warnings to the time-tested *Miranda* formulation." *Clenney*, 631 F.3d at 668; *see Harris v. Riddle*, 551 F.2d 936, 938–39 (4th Cir. 1977).

The inquiry into whether an individual has waived his *Miranda* rights has "two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see Edwards v. Arizona*, 451 U.S. 477,

52

482 (1981); *United States v. Cristobal*, 293 F.3d 134, 139 (4th Cir. 2002). The government must first show that the waiver of rights was "voluntary," *i.e.*, "that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Burbine*, 475 U.S. at 421. Second, it must prove that the waiver was made knowingly, meaning that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*; *see also Tague v. Louisiana*, 444 U.S. 469, 470 (1980); *Butler*, 441 U.S. at 373.

Absent *Miranda* warnings and a knowing, voluntary waiver, statements made during custodial interrogation are generally inadmissible at trial. *United States v. Hargrove*, 625 F.3d 170, 177 (4th Cir. 2010), *cert. denied*, 565 U.S. 899 (2011). As the Court explained in *Burbine*, 475 U.S. at 421, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (Citation omitted). To be a knowing and intelligent waiver, "'the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Cristobal*, 293 F.3d at 140 (quoting *Burbine*, 475 U.S. at 421). But, a statement that follows *Miranda* warnings will "[r]arely" be deemed involuntary. *Dickerson*, 530 U.S. at 444.

Therefore, at trial, in order for the government to introduce in evidence statements obtained from a defendant during custodial interrogation, the government must prove, by a preponderance of evidence, that law enforcement officers adequately informed the defendant of his *Miranda* rights and obtained a knowing and voluntary waiver of those rights. *See Miranda*, 384 U.S. at 476–79; *Cristobal*, 293 F.3d at 142. Courts have repeatedly said that the government bears the burden to prove that the warnings were provided, that the accused understood his rights, and that the accused made an uncoerced, voluntary, and informed statement. *See*, *e.g.*, *Berghuis v.*

*Thompkins*, 560 U.S. 370, 382-84 (2010); *Dickerson*, 530 U.S. at 444; *Colorado v. Connelly*, 479 U.S. 157 (1986); *Burbine*, 475 U.S. at 421; *Berkemer*, 468 U.S. at 429; *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Lego v. Twomey*, 404 U.S. 477, 482-84 (1972); *Ivey*, 60 F.4th at 112; *Giddins*, 858 F.3d at 879; *Hargrove*, 625 F.3d at 177; *United States v. Cardwell*, 433 F.3d 378, 389 (4th Cir. 2005).   But, "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *see Colorado*, 479 U.S. at 168–69 ("Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence."); *see also United States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005).

A waiver of rights may be express, either orally or in writing, or it may be implied from a defendant's actions and words. *Berghuis*, 560 U.S. at 384; *Cardwell*, 433 F.3d at 389. *Miranda* "does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights." *Berghuis*, 560 U.S. at 389.  Therefore, a court may "infer a waiver of *Miranda* rights 'from the actions and words of the person interrogated.'" *Id.* at 387 (quoting *Butler*, 441 U.S. at 373).  To determine if there is a waiver, whether express or implied, the court must consider all of the circumstances. *Berghuis*, 560 U.S. at 389.

As stated, to be a knowing and intelligent waiver, "'the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Cristobal*, 293 F.3d at 140 (quoting *Burbine*, 475 U.S. at 421).  But, "[a]s a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 389.  Of relevance, "a suspect

who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Id.* at 388-89.

In addition to ensuring that a defendant received the protections afforded by *Miranda*, a court must determine whether any custodial statements were made voluntarily, in keeping with the Due Process Clause of the Constitution.  The Fourth Circuit has said: "The test for determining whether a statement is involuntary under the Due Process Clause is whether the defendant's will has been overborne or his capacity for self-determination critically impaired because of coercive police conduct." *Cristobal*, 293 F.3d at 140 (internal quotation marks and citations omitted).  "To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id*. (internal quotation marks omitted).

In particular, a court must consider "'whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence.'" *United States v. Whitfield*, 695 F.3d 288, 301 (4th Cir. 2012) (quoting *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012)).  However, "'[e]ven where threats, violence, implied promises, improper influence, or other coercive police activity exist,' . . . a confession may yet be voluntary . . . ." *Whitfield*, 695 F.3d at 301; *cf. United States v. Azua-Rinconada*, 914 F.3d 319, 324-25 (4th Cir. 2019) (concluding that officer's statement, "'[O]pen the door or we're going to knock it down'", "did not fatally infect the voluntariness of the consent" provided by the defendant to a warrantless entry of his residence).

Moreover, "there is 'no duty to advise [a defendant] of the identity of the specific offense under investigation.'" *Giddins*, 858 F.3d at 883 (quoting *United States v. Braxton*, 112 F.3d 777,

784 (4th Cir. 2017)).  In addition, "'[p]loys to mislead a suspect or lull him into a false sense of security'" are not per se unconstitutional.  *Giddins*, 858 F.3d at 883 (quoting *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)).

It is pellucid that the application of *Miranda* is triggered only in a custodial setting. *Miranda*, 384 U.S. at 441, 444; *see Montejo v. Louisiana*, 556 U.S. 778, 794 (2009); *Yarborough v. Alvarado*, 541 U.S. 652, 660 (2004).  "The *Miranda* custody inquiry is an objective test." *Yarborough*, 541 U.S. at 667; *see J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011); *United States v. Hashime,* 734 F.3d 278, 285 (4th Cir. 2013).  "When determining whether an interrogation is custodial for purposes of *Miranda*, 'a court asks whether, under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest.'"  *Azua-Rinconada*, 914 F.3d at 325-26 (citing *Hashime*, 734 F.3d at 282) (internal quotations, brackets, citation omitted).  The inquiry "asks whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave."  *Hashime*, 734 F.3d at 282-83.

For purposes of the Fifth Amendment, the concept of "custody" does not necessarily require a formal arrest.  "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam); *see Oregon*, 429 U.S. at 495; *Hashime*, 734 F.3d at 282; *Hargrove*, 625 F.3d at 178.  Put another way, "'custodial interrogation'" means "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'"  *Yarborough,* 541 U.S. at 661 (quoting *Miranda*, 384 U.S. at 444).

In this case, it is clear that defendant was in custody at the relevant time for purposes of the *Miranda* and due process analysis.

56

### B.  Statements of March 14, 2024

As to defendant's statements on March 14, 2024, he contends that the *Miranda* waiver was invalid.  But, he primarily argues that his statements were involuntary.

With respect to the *Miranda* waiver, the defense argued at the motions hearing that Sergeant Antal "treated this waiver as a procedural checkpoint rather than a legitimate, constitutional safeguard . . . ."  ECF 97 at 146.[16]  Defense counsel pointed out that Mr. Howeth signed the waiver form while Sergeant Antal was still reading it.  *Id.*

Regarding voluntariness, defendant observes that the warrant was executed at 5:35 a.m., when approximately five officers "descended" upon Howeth's home.  ECF 50 at 3; *see id.* at 1.  The officers were "armed and uniformed."  *Id.* at 3.  Defendant was separated from his family and directed upstairs to his bedroom to get dressed.  Three armed officers were in his bedroom at the time.  *Id.*; ECF 97 at 145.  Howeth even had to use the bathroom while officers were stationed at the bathroom door.  ECF 97 at 145.  Howeth was then "led" to a police squad car, "flanked" by two officers, *id.*, and taken away from his family.  *Id.* at 144.  He asserts that "the only illumination came from the streetlights."  ECF 50 at 5.

As the defense puts it, Howeth "had no freedom of movement."  ECF 97 at 145.  And, during the interrogation, Antal was "within arm's reach" of defendant.  ECF 50 at 7; *see* ECF 97 at 146 (stating that Antal was less than six inches from defendant).  Moreover, when the interview began at about 5:58 a.m., defendant had barely been awake for a half hour.  ECF 97 at 147.

---

[16] In my view, the brief does not make clear how Sgt. Antal violated the strictures of *Miranda*.  *See* ECF 50 at 3-7.  Therefore, I point to the argument at the motions hearing.  The defense largely argued that, "under the totality of the circumstances, which include the setting of the interview, the characteristics of Mr. Howeth, and the details of the interrogation that Mr. Howeth's will . . . had been overborne and his capacity for self-determination had been critically impaired."  ECF 97 at 144.

I previously reviewed facts concerning the advisement of rights, which I incorporate here. I shall review some and elaborate.

Defendant appeared quite calm while getting dressed in his bedroom. Moreover, defendant had the wherewithal to ask to use the restroom, suggesting that he was not so intimidated by the presence of the MSP officers as to ignore his personal needs. Although three officers were in defendant's bedroom, they did not interact with defendant. Howeth moved freely about in his bedroom, without handcuffs, albeit with armed officers present.

In the police car, Sergeant Antal read each constitutional right aloud to the defendant. Tr. at 1. Defendant was presented with a form that contained all of the *Miranda* rights. ECF 50-2. He then signed the form, titled "Advice of Miranda Rights," acknowledging that he read his rights or they were read to him. *See id.* In addition, defendant signed the form for a second time under the paragraph titled, in bold letters: "Waiver of Miranda Rights." Defendant was not in handcuffs. No weapons were on display.

Antal did not confirm with defendant that he understood his rights and wanted to waive them. That would have been a better practice. But, he was not required to do so, and there was nothing at that point that flagged a reason for concern.

Undoubtedly, defendant was surprised by the presence of the police at his home at 5:30 a.m. However, many people are awake by that hour, especially with children who must get to school. In any event, there is no indication that Howeth did not have his wits about him by almost 6:00 a.m., when the waiver process began. The hour of day was not unreasonable.

The video recording of the interview does not reflect anything remotely approaching threats, promises, or coercion on the part of Sgt. Antal or Cpl. Tilghman. Defendant began to sign

the form as his rights were being read to him.  There was no hesitation.  And, he never asked for a lawyer.

Moreover, there is no indication that defendant did not understand his *Miranda* rights.  Nor is there any basis to suggest that defendant's will was in any way overborne by the detectives or that his capacity for self-determination was "critically impaired."  *Cristobal*, 293 F.3d at 140 (internal quotation marks and citation omitted).

The Supreme Court has observed: "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).  Similarly, in *Azua-Rinconada*, 914 F.3d at 319, in the context of a case concerning a custodial issue as to an illegal alien, the Fourth Circuit observed that the defendant was "undoubtedly intimidated during the interaction by having police in his home . . . ."  *Id*. at 326.  But, "that intimidation appeared no greater than that which is characteristic of police questioning generally."  *Id.*  The same is so here.

I am satisfied that defendant's statements during the interview were made knowingly and voluntarily, consistent with the requirements of *Miranda* and the Due Process Clause.  Therefore, I shall deny the motion to suppress the statements provided by defendant on March 14, 2024.

### C.  Statement of October 8, 2024

Defendant contends that suppression of his statement on October 8, 2024, is warranted because it "was made in direct response to a custodial interrogation" and the agents failed to advise him of his *Miranda* rights.  ECF 50 at 11.  Moreover, defendant contends that the agents violated his Sixth Amendment right to counsel.  *Id.*  In this regard, defendant notes that the encounter took place about six months after he was arrested on State charges.  Although Howeth had a lawyer in

connection with the State charges, his lawyer was not notified of the warrant in advance or present on October 8, 2024, when it was served on defendant.

In regard to the claim that an interrogation or its equivalent took place on that date, defendant relies on *Rhode Island v. Innis*, 446 U.S. 291 (1980).  There, the Supreme Court defined interrogation to include "any words or *actions* on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Id.* at 301 (emphasis added).  In this regard, defendant notes that the agents came to DCDC "months after Mr. Howeth's arrest . . . ."  ECF 50 at 12.

The agents had a warrant to photograph defendant's genitalia.  In my experience, this is not commonplace.  Howeth seems to argue that the presence of the FBI agents, for the purpose of serving a warrant to photograph his body, is tantamount to conduct or "actions" that were likely to elicit an incriminating statement.

It is well settled that the Fifth Amendment does not bar the admissibility of "volunteered statements," *i.e.*, statements made without any "compelling influences."  *Innis*, 446 U.S. at 300, 301.  Here, the testimony of the agents reflects that they informed defendant that they had a search warrant to take photographs of his person.  ECF 97 at 152.  They also showed defendant the search warrant and the attachments, which defendant read.  *Id.*  But, they never questioned him.  *Id.* at 160.

The reason for the warrant, even if unusual, does not transform the encounter into an interrogation or its equivalent.  I agree with the government that this interaction "is not the functional equivalent of an interrogation."  ECF 58 at 27 (citing *United States v. Blake*, 571 F.3d 331 (4th Cir. 2009)).

As to the Sixth Amendment claim, defendant cites no pertinent authority.  For its part, the government fails to address defendant's Sixth Amendment argument.

The Sixth Amendment provides:  "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  The right "attaches only at or after the initiation of adversary judicial proceedings."  *United States v. Gouveia*, 467 U.S. 180, 187 (1984); *see Fellers v. United States*, 540 U.S. 519, 523 (2004); *United States v. Alvarado*, 440 F.3d 191, 196-98 (4th Cir. 2006), *cert. denied*, 549 U.S. 817 (2006).

Of import, the Sixth Amendment right to counsel is offense-specific.  Therefore, "it does not attach until a prosecution is commenced."  *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).  It follows that the Sixth Amendment is not implicated if a defendant who has counsel is questioned about criminal activity for which he has not yet been charged.  *Id.* at 176; *see Texas v. Cobb*, 532 U.S. 162, 173 (2001); *United States v. Holness*, 706 F.3d 579, 590-91 (4th Cir. 2013), *cert. denied*, 571 U.S. 867 (2013); *United States v. Mir*, 525 F.3d 351, 355-56 (4th Cir. 2008).

In *Alvarado*, 440 F.3d at 196-98, for example, the Fourth Circuit, applying the dual sovereignty doctrine, found no error in the interrogation of a defendant represented by counsel in a State case as to related federal matters for which he was neither charged nor represented.  Here, defendant was not federally charged as of October 8, 2024, when the FBI agents served defendant with the search warrant.  He was, however, charged by the State and had counsel in that matter.  There is no contention that the agents engaged in "chicanery" to "subvert" defendant's Sixth Amendment rights.  *United States v. Barthelho*, 129 F.3d 663, 675 (1st Cir. 1997).

In my view, defendant's rights under the Fifth and Sixth Amendments were not violated in connection with the events of October 8, 2024.  Therefore, I shall deny the motion as to the statement of October 8, 2024.

## IV. Conclusion

For the reasons set forth above, I denied the motions by Order of April 1, 2025. *See* ECF 101.


Date:   April 3, 2026                                    _____/s/_____
                                                        Ellen L. Hollander
                                                        United States District Judge